[No. 22744-1-I.   Division One.   April 6, 1992.]

QUEEN CITY FARMS, INC., *Appellant,* v. THE CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, ET AL, *Respondents.*

*Kirk A. Dublin, Paul J. Lawrence, Desmond L. Brown,* and *Preston Thorgrimson Shidler Gates & Ellis,* for appellant.

*Pamela A. Lang* and *Hallmark, Keating & Abbott, P.S.; William J. Price* and *Karr Tuttle Campbell; David M. Schoeggl* and *Lane Powell Spears Lubersky,* for respondents.

*Charles C. Gordon* on behalf of The Boeing Company; *William G. Clark* on behalf of Champion International Corporation; *Dennis J. Dunphy* and *Bradley P. Thoreson* on behalf of Time Oil Company; and *Jon M. Schorr* on behalf of Public Utility District No. 1, amici curiae.

KENNEDY, J. — Appellant Queen City Farms, Inc. (QCF) filed this action in 1986 seeking a declaratory judgment that its various comprehensive general liability insurance carriers were responsible for clean-up costs incurred by QCF following the seepage of hazardous wastes into the groundwater from the disposal site on QCF's property. In August 1983, and again in October 1985, QCF and The Boeing Company (the major waste disposer at the site) signed EPA consent orders jointly agreeing to clean up the property. By the time of trial, QCF's share of the clean-up costs totaled

more than $1.8 million. QCF's maximum additional potential liability for these costs is $5.5 million. QCF appeals the trial court's order of July 18, 1988, dismissing its claims against Ernest A. Moore & Companies, an underwriter at Lloyd's, London, and certain London market insurance companies (Lloyd's); Central National Insurance Company of Omaha and a related company, Highlands Insurance Company (Central National/Highlands); and Maryland Casualty Company (Maryland Casualty).[1] The responding insurers provided excess coverage for Seattle Disposal Company (SDC) and a number of its subsidiaries, including QCF.

The order of dismissal followed a jury trial on certain factual disputes which had to be resolved in order to determine coverage under the policies.

All of the responding insurers except Lloyd's had issued policies containing qualified pollution exclusion clauses. By motion for summary judgment prior to trial, these insurers sought dismissal of QCF's claims, arguing that coverage was excluded as a matter of law, no matter how the disputed facts might be resolved, by reason of the pollution exclusion clauses. This motion was denied and the affected insurers have cross-appealed, seeking reversal of the order denying summary judgment of dismissal, in the event this court reverses the judgment which was entered on the jury verdict in favor of the responding insurers.

Several of the issues raised by QCF in this appeal and the issue raised by the insurers on cross appeal are of broad public interest and of substantial interest to the insurance industry and to policy holders. This is particularly so of those policy holders who have purchased comprehensive general liability "occurrence" policies over a period of many years and who now face retroactive, no-fault liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* (CERCLA). The issues are equally of interest to the

---

[1] QCF's claims against a number of its insurers had earlier been settled or dismissed by the trial court and are not a subject of this appeal.

insurers which issued the policies under which coverage is sought. Accordingly this court has accepted, received and considered briefs of amici curiae The Boeing Company, Champion International Corporation, Time Oil Company and Monsanto Company (collectively referred to as amicus Boeing); Public Utility District 1 of Chelan County; and The Insurance Environmental Litigation Association (amicus Insurance Association).

# I
## ISSUES

The dispositive issues on appeal are as follows:

A. Issues Raised by QCF.

1. Did the trial court err by instructing the jury that QCF's expectation of groundwater pollution arising from the operation of its disposal site was to be determined on an objective, reasonable person basis rather than solely on a subjective basis? We hold that the trial court did err. The policy provisions in question provide coverage for

> an accident or a happening or event or a continuous or repeated exposure to conditions which *unexpectedly and unintentionally* results in . . . property damage . . . during the policy period.

(Italics ours.) We construe this language under Washington law to preclude coverage under these comprehensive general liability policies only if QCF *subjectively* expected and intended to cause the groundwater pollution which occurred.[2]

2. Did the trial court err by instructing the jury that QCF bore the burden of proving that it did not expect its disposal activities to result in groundwater pollution? We hold that the trial court did not err in placing the burden of proof as to QCF's subjective expectation and intent upon QCF (the instruction in question was erroneous only insofar as it also included reference to the objective standard of expectation).

3. Did the trial court err by failing to dismiss Lloyd's and Central National/Highlands' intentional misrepresentation defenses for their failure to timely tender the insurance

---

[2]This ruling will require a new trial as to Central National/Highlands and Maryland Casualty, but not as to Lloyd's.

premiums paid for the coverage they sought to avoid? We hold that the trial court did err. This ruling will require that we reverse the order of dismissal as to Lloyd's and remand for entry of judgment that Lloyd's is obligated to provide coverage under its policies. At the new trial as to Central National/Highlands this will also require that the misrepresentation defense be stricken.[3]

B. Issue Raised by the Cross-Appealing Insurers.

Did the trial court err by failing to grant summary judgment of dismissal of QCF's claims based on the qualified pollution exclusion clauses contained in the policies issued by Central National/Highlands and Maryland Casualty? We hold that the trial court did not err.

II

FACTS AND PROCEDURAL HISTORY

A. History of the Property.

The property at issue is located near Maple Valley, Washington. It was originally purchased by the owners of SDC in 1951 for use as a hog farm.[4] The hog farm was operated for approximately 5 years in the mid-1950's. Before purchasing the parcel SDC had the property examined by an engineering company to determine its suitability as a hog farm. The engineering company reported that the property had "good drainage".

SDC eventually ceased operating the hog farm. In the mid-1950's representatives of the King County Health Department approached SDC and requested that the owners permit

---

[3]This ruling makes it unnecessary for us to decide QCF's remaining assignments of error which were raised in connection with the misrepresentation defenses.

[4]SDC was founded by John Banchero, Sr., Josie Razore and Alfonse Morelli, initially as a partnership and later, in 1943, as a closely held corporation. QCF was incorporated in 1966. Title to the property was transferred to QCF at the time of its incorporation. QCF is one of a number of subsidiaries of SDC. The shareholders of QCF are the same as for SDC. SDC is one of the largest garbage hauling and disposal businesses operating in Washington. It has handled garbage for the City of Seattle since 1938. In the 1950's SDC and its subsidiaries collectively were the largest earth excavation contractor in the Seattle area. A gravel mining operation is still carried on at the property in question.

oil, paint, roofing materials and tar to be disposed of on the property. This request was made because King County did not own an adequate disposal site. The request was granted.

On January 1, 1956, local industries began depositing industrial waste into a natural gully on the property. As the gully filled, dikes were built to separate the gully into three ponds. These ponds were constructed by deepening the gully and using the earth scooped from the bottom of the gully to create berms surrounding and separating the three ponds. The ponds were arranged so that as the first one filled to capacity the liquid would pour over into the second and third ponds. The total capacity of the ponds was approximately 1 million gallons.

In 1957, SDC entered into an arrangement with The Boeing Company. Between 1957 and 1969 Boeing dumped millions of gallons of highly toxic wastes into the ponds.

Although no permits were ever issued for the disposal operation, the King County Health Department and the Washington State Pollution Control Commission were generally aware of and monitored the disposal operations. By 1959, there was some evidence of contamination seeping from the ponds into a nearby lake and into a stream some distance away. However, a thorough investigation was not made and although several employees of the State's Pollution Control Commission knew about and deplored the industrial waste dumping that was going on, the agency never took formal action to halt the dumping. Josie Razore testified that the ponds were "checked all the time . . . but they never shut us down, never complained about our operation."

In 1966, when QCF acquired title to the property, it continued to operate the disposal site. QCF's owners testified at the trial that they believed that large quantities of waste in the ponds were eliminated when the ponds were periodically set ablaze and burned to keep them from overflowing. The burnings created a tarlike sludge seal at the bottom of the ponds which appeared to contain most of the unburned waste within the ponds. The owners testified that they believed that any waste which entered the ground would be

purified and filtered by the sand, hardpan clay and gravel surrounding the ponds.

Two of the owners maintained summer homes on the property near the ponds. The water supply for their families, their employees and their farm animals came from a spring and adjacent well located approximately 2,000 feet downhill from the ponds. Razore had the well water tested annually to ensure it was safe for human consumption. No contamination has ever been found in the well.

The dumping of wastes into the ponds was discontinued in 1969. The ponds lay dormant until September 1979, when the United States Environmental Protection Agency and the Washington Department of Ecology began investigating the property for hazardous waste contamination. In 1983, EPA testing revealed that chemicals had leached from the ponds and contaminated the groundwater underlying the property. Cleanup then began, pursuant to the consent orders signed by Boeing and QCF.[5]

B. History of Insurance.

SDC/QCF's owners hired insurance brokers, rather than dealing directly with their insurers. The brokers were instructed to obtain the most comprehensive insurance available for SDC and its subsidiaries, including QCF. Insofar as the responding insurers are concerned, the following excess coverages were obtained:

| Insurer | Policy Period | Amount |
|---|---|---|
| Lloyd's | 01/01/66 to 01/01/69 | $1 million per year |
| Maryland Casualty | 01/01/75 to 01/01/77 | $1 million per occurrence |
| Central National | 01/01/77 to 03/11/79 | $2 million per occurrence |
| Highlands | 03/11/79 to 03/11/81 | $5 million per occurrence |
| Central National | 03/11/81 to 03/11/82 | $5 million per occurrence |

---

[5]Our State Supreme Court has already decided that these clean-up costs properly constitute "damages" within the meaning of these standardized comprehensive general liability policies. *See Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 784 P.2d 507 (1990).

Ronald Kokesh was the broker who obtained the coverage at Lloyd's. Because Lloyd's did not use a preprinted application form, Kokesh followed Lloyd's standard practice and submitted a letter which described the properties and businesses for which SDC sought coverage. Although Kokesh had been to the property and knew about the ponds, he inaccurately described the farm as 160 acres of vacant land. Instead, it was 320 acres containing two homes, various buildings and the hazardous waste dump site. SDC was the main insured, and its garbage hauling operations were accurately described. When Lloyd's inquired of Kokesh whether SDC operated any dump sites, Kokesh responded that SDC did not operate "dumps" (Kokesh testified he had understood this question to relate to solid waste garbage dumps).

Thomas Jackson was the broker hired to obtain the Central National/Highlands policies. By the time these policies were obtained QCF had ceased operating the disposal ponds for several years. The application forms for these policies made no inquiry as to QCF's past operations, but did require information relevant to the risks for which coverage was sought. Jackson did not disclose the ponds or the past operations on those application forms. The underwriter, Ed Lea, testified that he could not recall whether the insurer had ever asked Jackson about QCF's past operations, but that he would not have issued the insurance had he known about the ponds. There was no testimony as to whether Central National/Highlands would have issued the policies had the ponds been disclosed.

The three insurers learned about Kokesh's misrepresentations and about Jackson's failure to disclose QCF's past operations in the summer of 1987, during the discovery for those proceedings. In October 1987, Lloyd's filed its answer to QCF's amended complaint and pleaded intentional misrepresentation as a defense to coverage. Central National/Highlands answered the amended complaint in December 1987, and pleaded intentional misrepresentation as a defense to coverage. Lloyd's tendered the return of QCF's

insurance premiums (if that amount could be determined)[6] on the second day of trial. Central National/Highlands has never, prior to the filing of the insurers' briefs for this appeal, tendered the return of QCF's premiums. Trial commenced in May 1988.

At the commencement of trial QCF moved to strike the intentional misrepresentation defenses on the basis that none of the insurers who raised the defenses had tendered the return of QCF's insurance premiums. The court denied the motion but sua sponte granted QCF the right to renew the motion if the jury returned an adverse verdict on the defenses. The jury did return an adverse verdict on the misrepresentation issues and QCF moved for judgment notwithstanding the verdict. The trial judge denied the motion.

C. Special Verdict Form.

At the trial to determine issues germane to insurer liability, the jury was required to respond to a special verdict form. Insofar as is relevant to this appeal the interrogatories posed and the jury's answers were as follows:

QUESTION NO. 1. Before March 1, 1966, did [QCF] expect or intend, or should [QCF] reasonably have expected, that materials would leak from its disposal ponds into groundwater?
ANSWER: No
. . . .
QUESTION NO. 2. Did there come a time after March 1, 1966 and before March 11, 1981 that [QCF] expected or intended, or should reasonably have expected, that materials would leak from its disposal ponds into ground-water?
ANSWER: Yes
. . . .

---

[6]A single annual premium was paid to each insurer by SDC for the excess coverage. It is undisputed that seepage from the waste ponds continued throughout the years in which Lloyd's (1966-1969) and Central National/Highlands' (1977-1981) policies were in effect. According to appellant, SDC paid a total of approximately $18,000 for the Lloyd's coverage and approximately $125,000 for the Central National/Highlands' coverage during those years. According to Lloyd's, the amount of its annual premiums which was attributable to QCF was de minimus, perhaps as little as $4 per year. Central National/Highlands has not provided this court with any estimate of the amount of its annual premiums which was attributable to QCF.

QUESTION NO. 3. If you find that such a time did come between March 1, 1966 and March 11, 1981, enter the date in the space below.

DATE: _____12-31-68_____ (must be between March 1, 1966 and March 11, 1981)[7]

QUESTION NO. 4: Did [QCF] or its brokers intentionally make one or more material misrepresentations or concealments to any of the defendants listed below about the [QCF] site with an intent to deceive?

ANSWER: For each insurer listed below, answer either "Yes" or "No":

<u>Yes</u> Lloyd's of London
<u>Yes</u> Central National/Highlands

As can be seen, the jury found that before December 31, 1968, QCF neither subjectively nor objectively expected pollution to occur. The Lloyd's policies are for the period January 1, 1966, to January 1, 1969, and those policies contain no pollution exclusion clauses. The intentional misrepresentation defense was Lloyd's only defense as to coverage, once the jury found that QCF neither subjectively nor objectively expected pollution to occur during the period of coverage by Lloyd's.

QCF, by pretrial motion, had sought a ruling that its expectation of pollution be measured by the subjective standard of what QCF *actually* expected and intended, rather than what another person, the proverbial "reasonable person", might have expected or intended in similar circumstances. This motion was heard by a different judge from the trial judge, and the ruling was that if QCF either subjectively did or objectively should have foreseen the pollution, there was no coverage. The trial judge advised both parties that he would not entertain any reargument of the pretrial rulings. When proposed jury instructions were submitted the trial judge reiterated that he would not allow the instructions to be used as a means to reargue the pretrial rulings.

At the time for exceptions to the jury instructions, counsel for QCF stated as follows:

---

[7]The dates in these interrogatories generally correspond to the periods of coverage of the various insurance policies.

Your Honor, just for the record, and this may be put in your Court's order, before Judge Shellan we had argued that a subjective standard should be used in determining the expected or intended issue, and that decision was made prior to any time period for filing jury instruction[s], so for the purposes of appeal, we do preserve that issue, but because it was decided prior to the time for filing instructions, we have not filed a subjective standard instruction.[8]

QCF raised no objection to the compound form of the first two questions posed on the special verdict form. In fact, QCF's proposed special verdict form contained similar compound questions with respect to the subjective and objective expectation of pollution.

## III
### DISCUSSION
A. Subjective or Objective Standard.

QCF contends that Washington law, with certain public policy exceptions, only requires that an insured subjectively believe that its actions will result in injury in order for there to be no coverage under policies such as those at issue here. The insurers argue that Washington law precludes such coverage when the insured knew or reasonably should have known that its deliberate act more likely than not would cause injury. Each side cites cases which appear, at least by way of dictum, to support its position.

Before addressing this issue on its merits, however, we first address the insurers' contention that QCF has not preserved this issue for appeal. The insurers argue that QCF could have objected to the compound form of the questions posed on the special verdict form, and that had QCF done so there would be no need for a new trial, if this court were to rule that only the subjective standard should have been used in instructing the jury.

---

[8]The insurers preserved their appeal rights in the same way, stating at the same hearing for exceptions to the instructions: "And it's our belief that failing to propose instructions on those issues, because of the adverse rulings, does not constitute a waiver of our position that some or all of those issues should have been presented to the jury."

QCF responds by pointing out that the trial court refused to allow any reargument of the pretrial rulings by either side; that both sides preserved their objections for the record by referring to those pretrial rulings during the hearing on the exceptions to the instructions; and that to have broken down the compound questions on the special verdict form into separate interrogatories relating to subjective and objective expectation would not have cured the error because the jury had already heard so much evidence as to the objective standard that its determination of the subjective standard would necessarily be tainted.

CR 49(a), which governs the use of special verdicts, states in pertinent part that if

> the court omits any issue of fact raised by the pleadings or the evidence, each party waives his rights to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury.

In general, CR 49(a) requires a party to object to the form of a special verdict while the trial court still has control over the form. *Lahmann v. Sisters of St. Francis*, 55 Wn. App. 716, 723, 780 P.2d 868 (1989); *see also Anderson v. Cryovac, Inc.*, 862 F.2d 910, 918 (1st Cir. 1988). The rule can apply when a party fails to request that a special verdict be broken down into separate questions. *Lahmann*, at 723.

In the context of this case, however, QCF's objection was not with the *form* of the special verdict; rather, the objection was to the pretrial ruling which allowed the jury to be misinstructed. The special verdict form was adequate, in view of the jury instructions given. Without implying that we necessarily agree that the jury could not have rendered a fair and competent verdict as to QCF's actual, subjective intent and expectation of pollution, separate from its verdict as to QCF's objective expectation, we do note that the evidence at trial included substantial testimony which would support the finding of objective expectation. Some of this evidence might not be admissible at a trial where the only issue is subjective expectation. Some of the same evidence as presented in this trial might be admissible, as tending to

disprove or impeach the owners' testimony as to their subjective expectation.[9] Those evidentiary issues are not before us in this appeal and we are not willing to assume, in the absence of full briefing and argument, that the effect of the erroneous instruction could have been cured by breaking the compound questions posed in the special verdict into their component parts, as argued by the insurers.

To the extent that CR 49(a) may be applicable to the preservation issue for this appeal, we note that case law in this jurisdiction has never addressed the question of what type of an objection is sufficient to satisfy the dictates of the rule. Under the related rule of CR 51(f), a party which fails to adequately support an objection to an instruction may still preserve its appeal if the court is "clearly apprised" of the points of law in dispute. *Falk v. Keene Corp.*, 113 Wn.2d 645, 658, 782 P.2d 974 (1989); *see also Crossen v. Skagit Cy.*, 100 Wn.2d 355, 358, 669 P.2d 1244 (1983).

In *Falk*, the court held that objections to a jury instruction regarding the standard to be applied to defendant's action was notice to the trial court of objections regarding the standard in related jury instructions. *Falk*, 113 Wn.2d at 658. Authority regarding CR 51(f) has been applied to objections in CR 49(a) cases under the analogous federal rules. *See J.C. Motor Lines, Inc. v. Trailways Bus Sys., Inc.*, 689 F.2d 599, 602 n.1 (5th Cir. 1982). Furthermore, CR 46, which deleted the requirement of formal exceptions to court rulings, has been held applicable to jury instructions. *See Moore v. Mayfair Tavern, Inc.*, 75 Wn.2d 401, 407, 451 P.2d 669 (1969).

■ The trial court in the present case was clearly apprised of QCF's objection to the use of the objective standard. Accordingly, we hold that QCF has preserved its right

---

[9] In weighing the credibility of an insured's testimony that he or she did not subjectively intend or expect a particular result, a jury may properly consider the reasonableness of the testimony of the witness in light of *all of the evidence*. WPI 2.01.

to appeal the trial court's application of the objective standard of expectation in this case.[10]

With respect to the merits of the issue on appeal, we first comment that it is difficult to fully reconcile the seemingly conflicting opinions handed down by the Washington courts over a period of many years with respect to the appropriate standard to be applied. Accordingly, while we have thoroughly reviewed the relevant cases and found certain identifiable factors and consistent themes which have assisted the analysis, we have found it necessary to return to the language of the policies themselves and to analyze that language in light of the rules of construction found in Washington case law to determine the meaning of the clauses at issue. Our conclusion regarding the meaning of the clauses is further bolstered by the more recent pronouncements of our state Supreme Court in opinions which have directly discussed the subjective-objective issue in the context of contemporary comprehensive general liability policies.

■■ We start with the premise that the construction of a contractual insurance policy provision is a question of law and therefore subject to de novo appellate review. *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 95, 776 P.2d 123 (1989) (citing *Sears v. Grange Ins. Ass'n*, 111 Wn.2d 636, 638, 762 P.2d 1141 (1988)). The policy "should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Sears*, at 638; *Brosseau*, at 95.[11]

---

[10]CR 49(a) also provides that

[a]s to an issue omitted [from the special verdict] without [a demand for its submission to the jury] the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

Such provision is not applicable in this case where the issue relates to an erroneous instruction by which a superfluous issue was included in the special verdict form.

[11]It has sometimes been suggested that a different standard ought to apply to the construction of insurance policies purchased by large commercial enterprises

"In construing the language of an insurance policy, the entire contract must be construed together so as to give force and effect to each clause." *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 876, 784 P.2d 507 (1990) (citing *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d 452, 456, 760 P.2d 337 (1988)).

Undefined terms in an insurance contract must be given their " 'plain, ordinary and popular' meaning." *Boeing*, at 877 (citing *Farmers Ins. Co. v. Miller*, 87 Wn.2d 70, 73, 549 P.2d 9 (1976)); *Prudential Property & Cas. Ins. Co. v. Lawrence*, 45 Wn. App. 111, 724 P.2d 418 (1986). To determine the "plain, ordinary and popular meaning" of such undefined terms, the courts look to standard dictionaries. *Boeing*, at 877 (citing several earlier cases).

The relevant clause in the instant appeal provides coverage for "an accident . . . happening or event . . . which *unexpectedly* and *unintentionally* results in . . . property damage . . .". (Italics ours.) The words *unexpectedly* and *unintentionally* are not defined in the policy, and the question to be determined is *to whom* must the damage have been unexpected? Is it the individual insured? Or is it the proverbial "reasonable person" who is not to have expected the damage, in order for the insured to qualify for the coverage? Or, as was ruled in the pretrial motions, must both standards be satisfied?

Certainly the word *unintentionally* is subjective in nature, but the word *unexpectedly* could reasonably be construed either subjectively or objectively. It could also be construed to encompass both standards, neither to the exclusion of the other. *Webster's Third New International Dictionary* 2494 (1986) defines "unexpected" as "not expected : UNLOOKED-FOR, UNFORESEEN, SURPRISING". The verb "expect" includes "to

---

from those purchased by ordinary consumers. Such a distinction has not been recognized by our state Supreme Court. Instead, that court rejected a similar argument in *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 882, 784 P.2d 507 (1990).

await, look forward to . . . to anticipate . . . [to] SUPPOSE, THINK, BELIEVE". *Webster's*, at 799. Synonyms include

> HOPE *(for)*, LOOK *(to)*, LOOK *(for)*, and AWAIT can mean, in common, to anticipate in the mind a thing or an event more or less likely . . . to occur. Expect usu[ally] implies a high degree of certainty to the point of making preparations . . ..

*Webster's*, at 799. While these dictionary definitions relate to a state of mind, which in and of itself seems to imply a subjective connotation, certainly a reasonable person's state of mind, as opposed to that of the insured, is not automatically excluded from these definitions.

■ However, the purpose of insurance is to insure. While the courts protect insurers against unjust claims, where a policy is naturally and reasonably subject to more than one commonsense construction, a construction should be taken which renders the contract operative rather than inoperative. *Scales v. Skagit Cy. Med. Bur.*, 6 Wn. App. 68, 70, 491 P.2d 1338 (1971) (citing 13 J. Appleman, *Insurance* § 7386 (1943)); *Lawrence v. Northwest Cas. Co.*, 50 Wn.2d 282, 311 P.2d 670 (1957); *Anderson & Middleton Lumber Co. v. Lumbermen's Mut. Cas. Co.*, 53 Wn.2d 404, 333 P.2d 938 (1959).

> As further noted in Appleman, at § 7401, p. 50, it has been almost the unanimous holding of all courts that insurance contracts must be liberally construed in favor of a policyholder or beneficiary thereof, whenever possible, and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance. Courts have felt that the language of insurance policies is selected by one of the parties alone and the language employed by that party should be construed against it.

*Scales*, at 70. *See also Nautilus, Inc. v. Transamerica Title Ins. Co.*, 13 Wn. App. 345, 349, 534 P.2d 1388 (1975) ("where two constructions are possible, the 'construction most favorable to the insured must be applied . . .' ") (quoting *Selective Logging Co. v. General Cas. Co. of Am.*, 49 Wn.2d 347, 351, 301 P.2d 535 (1956)).

QCF argues that the construction argued by the insurers would frustrate the very reason people purchase insurance: to protect themselves against the consequences of their own negligence. The insurers argue that this would not be the result for most cases of "ordinary" negligence, although they agree it would be the result for cases of "ordinary negligence where the conduct is more likely than not to cause harm", and for all cases of gross negligence.[12]

Negligence has a tortious connotation and in tort law there is a rebuttable presumption that a person intends the ordinary consequences of his voluntary act. If we were to apply this presumption of tort law to the interpretation of contract terms in this insurance case, respondents' argument that "unexpectedly and unintentionally" must be construed on an objective standard would be logical. However, while not universally recognized, the general rule has been that this presumption does *not* apply to negligent conduct for the purpose of construction of insurance polices. 7A J. Appleman, *Insurance* § 4492.03 (1979).

We find this general rule persuasive and hold that in Washington the presumption that a person intends the ordinary consequences of his voluntary act does not apply to negligent conduct for the purpose of construing contemporary comprehensive general liability insurance "occurrence" policies, with certain exceptions (discussed later in this opinion) based on public policy. With respect to the opposing minority view, *i.e.*, that damage which is the natural and probable consequence of a negligent act is not unexpected and therefore not "caused by accident" within

---

[12]Negligence is defined for juries in Washington as the failure to exercise ordinary care. It is the doing of some act which a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances. WPI 10.01. Gross negligence is defined for juries as the failure to exercise slight care. It is negligence which is substantially greater than ordinary negligence. Failure to exercise slight care does not mean the total absence of care but care substantially less than ordinary care. WPI 10.07. Black's Law Dictionary 931 (5th ed. 1979) defines "negligence" as conduct which poses an "unreasonable risk of harm . . . from which injury may result."

the coverage of a comprehensive general liability policy, Appleman states:

> This . . . minority view is, of course, nonsense. The average insured is an average man, possessing frailties and prone to carelessness either by act or omission. While driving, he turns around to talk to a passenger in the rear seat of a car; he smokes in bed; he may even wink at another man's wife — all acts of rashness. And he recognizes his imperfections when he insures, and pays for protection from the consequences of careless, as distinguished from immoral, acts. The insurer knows this when it accepts his premiums. He is, accordingly, entitled to that protection — and the minority rule would deprive him of it.

7A J. Appleman § 4492.03 n.8.

We agree. It is not the *degree* of negligence, but rather the expected and intended injuries flowing from intentional acts which are excluded from coverage. 7A J. Appleman § 4492.02. Even gross negligence or willful and wanton conduct may be covered, where there has been no actual intent to injure. *See, e.g., Morrill v. Gallagher*, 370 Mich. 578, 122 N.W.2d 687 (1963) (coverage for injury caused by thrown firecracker); *Peterson v. Western Cas. & Sur. Co.*, 5 Wis. 2d 535, 93 N.W.2d 433 (1958) (insured grossly negligent when his auto struck a police officer as insured attempted to avoid arrest; coverage found); *Travelers Ins. Co. v. Reed Co.*, 135 S.W.2d 611 (Tex. Civ. App. 1939) (insured's boorish conduct in attempting to collect overdue bill was willful and wanton, but he did not intend to cause debtor's wife to have nervous breakdown and miscarriage; coverage found); *White v. Smith*, 440 S.W.2d 497, 509-10 (Mo. Ct. App. 1969) (blood from insured's slaughterhouse seeped into groundwater and contaminated neighbor's well; insurer claimed no coverage because insured's operation of slaughterhouse intentional and subsequent damages were "natural consequence" and "readily foreseeable"; coverage found on the basis that there is a vast difference between an intended *act* and an intended *result*; to rule otherwise would exclude many if not most claims and defeat primary purpose of liability insurance); *Northwest Elec. Power Coop., Inc. v. American Motorists Ins. Co.*, 451 S.W.2d 356 (Mo. Ct. App. 1969) (insured power

company negligently constructed transmission line through middle of valuable farmland rather than across corner of tract where easement lay; insurer argued no coverage since damage, while subjectively unexpected, was the result of gross negligence and therefore constructively foreseeable; insurer's argument rejected and coverage found).

■ Although standard comprehensive general liability "occurrence" clauses today generally utilize the phrase "expected or intended from the standpoint of the insured", and the phrase "from the standpoint of the insured" is not present in the insurance clauses at issue here, we do not think this implies that clauses without these words were intended to be governed by the objective standard. As stated by the Supreme Judicial Court of Maine, which undertook a similar inquiry to ours in the case of *Patrons-Oxford Mut. Ins. Co. v. Dodge*, 426 A.2d 888 (Me. 1981):

> We first investigate the meaning of "expected or intended from the standpoint of the Insured."
> The insurance industry began to use this phrase in policies affording a general coverage for personal liability as of approximately 1966, when a "major revision" was undertaken of what had been, since 1940, an essentially standardized policy. *See* 7A Appleman, *Insurance Law and Practice* (Berdal ed.), Section 4491. Prior to 1966, the language employed to achieve a similar "exclusion" objective had been, generally, "bodily injury [or property damage] caused intentionally by or at the direction of the insured."
> The courts had experienced difficulties with this latter language insofar as it was being used to clarify the concepts of "accident" or "accidental means", as those concepts appeared in policies prior to 1966. One of the problems became manifest in *Sontag v. Galer*, 279 Mass. 309, 181 N.E. 182, 183-4 (1932). In that case the court rejected the view that "caused intentionally", as an amplification of the circumstances that would constitute an "accident" or "accidental means", signifies that the perspective is to be "from the . . . standpoint" of the victim. In the [*Sontag*] court's words:
>> "It is the state of the 'will of the person by whose agency it [the injury] was caused' rather than that of the injured person which determines whether an injury was accidental."
> In 7A Appleman . . . § 4492.02, at 27, this approach is characterized as "a form of punishment to the wrongdoer"; it "ignores the fact that insurance also is for the benefit of injured victims

of accidents." For this reason, in the language of the Appleman text, other courts "consider[ed] the resulting injury from the point of view of the victim", and

"[i]f it was accidental from that point of view, the loss will be covered by the liability insurance issued to the actor." . . .

It would appear that the change of language now under scrutiny, which emerged from the 1966 "revision" undertaking, had reference to this disagreement as to perspective, and that one of its purposes was to make more specific the concept of "accident" contained in the definition of "occurrence." The phrasing "from the standpoint of the Insured" would seem designed to make plain that the "accident" component of an "occurrence" is to be evaluated from the perspective of the insured rather than of the injured victim.

*Patrons-Oxford*, at 890-91.

The Maine court went on to point out that the word "expected" also had its origin in the 1966 revision of these standard clauses. Thus within the contemplation of post-1966 policies "accident" is negated not only where the bodily injury is "intended" but also where it is "expected".

Among various meanings this language may have, one reasonable meaning is that it connotes no *objective normative* criterion but rather refers *only* to the *actual subjective* state of mind of the insured in respect to the *results* of his intentional act.

Thus the language at issue is fairly open to the interpretation that coverage is not "excluded" if, notwithstanding what the average reasonable person in the position of the insured would have foreseen as a consequence of the insured's act, the insured himself did not have the *actual subjective* "intention" to cause, or the *actual subjective* "expectation" that a result of his conduct would be, bodily injury to another person.

Moreover, as to the further ambiguity arising from use of the word "expected" in immediate conjunction with "intended" to describe the actual *subjective* state of mind of the insured, one fair interpretation of the phrasing is that stated in *State Farm Fire & Casualty Company v. Muth*, 190 Neb. 248, 272, 207 N.W.2d 364, 366 (1973): "[i]t does not seem . . . designed . . . substantially [to] enlarge the exclusion." As the Nebraska court further explained:

"The term 'expected' when used in association with 'intended' carries the connotation of a high degree of certainty or probability . . .",

thus being "used . . . practically [to] equate with 'intended' . . .."

*Patrons-Oxford*, at 891.

As pointed out in 7A J. Appleman § 4491, and by way of further explanation of the 1966 revisions to this standard clause:

[N]ew policy language has been introduced in an attempt to clarify troublesome areas for the underwriters, or where court decisions were counter to insurer intentions.

We conclude that the "from the standpoint of the insured" language which does not appear in the policies now before the court, but which does appear in many contemporary policies, was not intended by the insurance industry to address the subjective-objective expectation controversy. Rather, the insurance industry appears to have intended, by the adoption of the phrase, to try to ensure that courts will construe the words "accident" and "occurrence" from the perspective of the insured and not from the perspective of the victim. Accordingly, the absence of the phrase "from the standpoint of the insured" in the policies in the instant appeal does not cause us to presume that these policies were intended (by the insurers) to require an objective construction of the word "unexpectedly".

We turn now to an analysis of the Washington case law on the issue of subjective-objective expectation.

QCF relies most heavily upon the case of *Rodriguez v. Williams*, 107 Wn.2d 381, 729 P.2d 627 (1986).[13] *Rodriguez* had first come before a panel at Division One of the Court

---

[13]QCF also relies upon *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, 93 Wn.2d 210, 608 P.2d 254 (1980). There our Supreme Court was called upon to construe an occurrence clause in the context of a products liability claim. The policy covered accidents which result "in . . . property damage neither expected nor intended from the standpoint of the insured." *Yakima Cement*, at 214. The subjective-objective expectation issue was not posed to the court. The issue instead was whether there had been an "accident", since the manufacturer had *intentionally* manufactured the product, albeit negligently. There was no issue as to whether Yakima Cement had intended or expected the resulting damage. It clearly had not, at least not subjectively. The case is thus not particularly helpful to the instant issue, although it does contain some dicta which would seem to imply a subjective standard. *Yakima Cement*, at 215.

of Appeals.[14] The policy in question specifically excluded coverage for bodily injury or property damage which is

> expected or intended by the insured, but this exclusion does not apply to any act committed by or at the direction of the insured not intended to cause serious bodily injury [or property damage.]

*Rodriguez*, 107 Wn.2d at 382-83. The plaintiff, Rodriguez, brought an action against Williams, her stepfather, for personal injuries arising out of incest. She also sought declaratory judgment that the homeowners' policy issued to Williams provided coverage for her damages. The panel at Division One defined "expected" to mean "more likely than not to occur", and determined that

> [a] child will more likely than not suffer mental and psychological injuries as a result of [incest]. Thus, such injuries would be "expected" by an average, reasonable person. As a matter of law, Rodriguez's injuries were "expected" by Williams[.]

(Citations omitted.) *Rodriguez*, 42 Wn. App. at 637.

Our Supreme Court agreed with Division One's result, but not with all of its reasoning. Williams' affidavit for the summary judgment proceeding in superior court stated that he had not subjectively intended to harm his stepdaughter. This was confirmed by Williams' clinical psychologist, who found no indication that Williams had any intent to cause physical or psychological harm to Rodriguez. While finding that these affidavits did raise genuine issues of fact, in the context of the particular case the issues were not material. Williams' subjective intent was irrelevant, simply because this was a case involving incest. Under ordinary rules of construction, coverage *would* be found, because the policy itself excluded only those injuries which are subjectively intended or expected by the insured. For reasons of public policy, however, the Supreme Court held that an insured

---

[14]*See Rodriguez v. Williams*, 42 Wn. App. 633, 713 P.2d 135, *aff'd*, 107 Wn.2d 381, 729 P.2d 627 (1986).

who commits incest intends the resulting harm as a matter of law.[15]

But in so ruling, the Supreme Court *rejected* the "reasonable person" approach of the panel at Division One:

> We do not agree with this analysis. While doubtlessly the average purchaser of insurance would believe that incest would harm a child, the policy specifically states that the *insured* must expect or intend harm. Thus, the policy language itself is inconsistent with a blanket objective person standard. . . . *Moreover, if an objective standard is used, virtually no intentional act would ever be covered. Intentional acts which result in injury generally can be expected to result in injury. An objective standard, especially provided after the fact, would seem to render meaningless the plain language providing for coverage for certain intentional acts.*

(Italics ours.) *Rodriguez*, 107 Wn.2d at 386.

The insurers rely upon a series of Washington cases which would appear to have applied the objective, reasonable person standard to the "expected" result of the acts of the insureds which were at issue. They argue that Washington case law has long since settled this issue, and that *Rodriguez* is limited to its own facts. We disagree that the case law has settled the question.

In *Diana v. Western Nat'l Assur. Co.*, 56 Wn. App. 741, 785 P.2d 479 (1990), a case upon which the responding insurers rely heavily, a panel of Division One of this court reversed a summary dismissal of a homeowner's claim that his insurance covered the damage to his home caused by the removal of supporting walls by a contractor who had remodeled the house. The contractor had assured the homeowner that the house would remain structurally sound if the walls were removed. The homeowner acquiesced. Subsequently a windstorm occurred, and the house began to collapse. The homeowner's insurer denied coverage. In fact, the insurer canceled the coverage, warning the homeowner as it did so that the house was in imminent danger of collapse in the next big storm.

---

[15]It has long been against public policy to allow a person to purchase insurance for his immoral, criminal or fraudulent acts. 6B J. Appleman, *Insurance* § 4252 (1979).

The homeowner sued his insurer. Both sides moved for summary judgment on the issue of coverage. The insurer won in superior court. Both sides agreed that the homeowner did not *subjectively* know that the walls removed by the remodeling contractor were load bearing. But they disagreed as to whether the homeowner *should have known* this to be true.

Without citing *Rodriguez*, a panel of this court stated that

> [i]t is not necessary that the claimant intend or expect the injurious consequences of [his] actions. *All that is required is that the claimant know or should know facts from which a prudent person would conclude that the injurious consequences are reasonably foreseeable.* Otherwise, an insured could shift intentionally inflicted injuries to an insurer in violation of public policy.
>
> Under the common law distinction between accidental results and accidental means, summary judgment is proper when the evidence establishes as a matter of law that the claimant's injury is (1) a "natural consequence" of deliberate conduct, and (2) not the product of an unusual or atypical intervening event.

*Diana*, at 744 (quoting *Lloyd v. First Farwest Life Ins. Co.*, 54 Wn. App. 299, 302-03, 773 P.2d 426, *review denied*, 113 Wn.2d 1017 (1989)).

The *Diana* court was focusing on the meaning of "accident" rather than of "occurrence". These are words that have distinct meanings due to revisions of the standard liability insurance policies. In an effort to reconcile all the conflicting Washington case law, the *Diana* court at pages 744-45 stated:

> An examination of Washington cases that deal with this question reveals a continuum. On one end of the spectrum, courts deny coverage as a matter of law when injuries or damages are intentionally inflicted by the claimant, or are against public policy. *See Grange*, 113 Wn.2d at 99 (intentional shooting of a person committed in self-defense by insured not covered by insurance policy as an "accident"); *Lloyd*, 54 Wn. App. at 304 (injuries resulting from intentional ingestion of cocaine held to be natural consequence of claimant's act, and therefore not an accident for purposes of insurance coverage); *Unigard* [*Mut. Ins. Co. v. Spokane Sch. Dist. 81*], 20 Wn. App. [261,] 263-64 [579 P.2d 1015 (1978)] (damage to school resulting from fire set in garbage can by 11-year-old boy not an

"accident" despite boy's claim that he neither intended nor expected the fire to damage the school). On the other end of the spectrum, when the facts clearly show that the insured had no actual or reasonable knowledge of the means or the likely result of the damage, the courts find coverage as a matter of law. *See Federated Am. Ins. Co. v. Strong*, 102 Wn.2d 665, 674, 689 P.2d 68 (1984) (damage resulting from insured's wife's intentional collision with two vehicles held accidental as to insured and covered by policy); *Roller v. Stonewall Ins. Co.*, 55 Wn. App. 758, 763-64, 780 P.2d 278 (1989) (injuries sustained by insured when ex-wife intentionally hit him with car held to be an accident and covered by insurance policy);[16] *Gruol Constr. Co. v. Insurance Co. of N. Am.*, 11 Wn. App. 632, 634-35, 524 P.2d 427 (damage caused by dry rot held not foreseeable and an "accident" for purposes of coverage under insurance policy where insured construction company had no actual or reasonable knowledge of defective backfilling), *review denied*, 84 Wn.2d 1014 (1974).

Other cases, such as this one, fall somewhere in the middle of the continuum. Although policy coverage is normally a question of law, this class of cases must be determined by their particular facts and the closeness of the relationship between the act and the result. One such case is *Detweiler*, 110 Wn.2d at 99.

We believe that the *Diana* court's continuum analysis was flawed and undermined by the court's failure to consider the nature and purpose of the revisions to the standard insurance policy language, a process which commenced in 1966. There is no indication from the *Diana* opinion, however, that these revisions were brought to the court's attention. Rather, the arguments were directed to the definition of "accident".

There are few insurance words that have provoked more controversy and litigation than the word "accident". . . . The 1966 Comprehensive General Liability policy changes attempted to give the word a more realistic meaning by substituting the word "occurrence" for "accident" and defining "occurrence" to mean "an accident, including injurious exposure to conditions, which results during the policy period,

---

[16]*Roller v. Stonewall Ins. Co.*, 55 Wn. App. 758, 780 P.2d 278 (1989) was later reversed by our Supreme Court at 115 Wn.2d 679, 801 P.2d 207 (1990). *See also Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 403, 823 P.2d 499 (1992) (holding that ruling in *Federated Am. Ins. Co. v. Strong*, 102 Wn.2d 665, 763-64, 689 P.2d 68 (1964) was overruled *sub silentio* in *Roller v. Stonewall Ins. Co.*, 115 Wn.2d at 685).

in bodily injury or property damage neither expected nor intended from the standpoint of the insured". Critics felt that the new definition was more restrictive than court interpretations of "accident". As a result, in 1972, the Comprehensive General Liability policy was changed so that "occurrence" now means "an accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured". The reference to the policy period is moved to the definitions of bodily injury and property damage.

7A J. Appleman, *Insurance* § 4492 (1979).

> *The newer definition of occurrence and accident eliminates the need for an exact finding of the cause of damages so long as they are neither expected or intended from the standpoint of the insured. . . . The purpose of substituting "occurrence" for "accident" in an endorsement to a policy was to broaden coverage and the words are not synonymous;* thus coverage extended to dry rot to apartment sills from dirt piled against box sills caused by improper backfilling and not detected during construction [(citing *Gruol Constr. Co. v. Insurance Co. of North Am.*, 11 Wn. App. 632, 524 P.2d 427 (1974))] . . ..

(Footnotes omitted. Italics ours.) 7A J. Appleman § 4493.

Our Supreme Court appeared implicitly to understand this concept in *Rodriguez*, and indeed we believe that *Rodriguez* points the way for all future analyses of these contemporary occurrence clauses:

> the policy language itself is inconsistent with a blanket objective person standard, and the policy language must control. Moreover, if an objective standard is used, virtually no intentional act would ever be covered.

*Rodriguez*, 107 Wn.2d at 386.[17]

---

[17]The recent case of *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 400-03, 823 P.2d 499 (1992) does not dictate a different result. In *Butler* our Supreme Court construed a homeowner's policy which defined an occurrence as an "accident" resulting in bodily injury. *Butler*, at 400. Butler, the insured, fired six shots with a handgun at a vehicle which was occupied by several young people who the insured believed had blown up his mailbox. One of the shots hit and seriously injured an occupant of the vehicle. The insured claimed he had intentionally shot at the vehicle rather than at the occupants, and that he had not intended that one of the bullets would ricochet and injure the victim. Pointing out that the insured was well trained and experienced in the use of firearms and that he had intentionally fired his gun at an occupied, metal vehicle, the Supreme Court concluded that this was no "accident" because "no reasonable person could conclude Butler was unaware of the possibility of ricochet, or that a ricochet

■ We determine the law in Washington to be that except in cases similar to *Rodriguez* (incest) and *First Farwest* (intentional ingestion of cocaine), where subjective intent and expectation of injury or damage is conclusively presumed as a matter of law, these comprehensive general liability insurance policies do provide coverage, *so long as* the insured neither intended nor *subjectively* expected the bodily injury or property damage to occur.

The "continuum" observed by the *Diana* court should be reanalyzed accordingly. The courts should view opinions construing the older "accident" policies with great caution, when construing contemporary "occurrence" policies. Similar caution should be exercised before relying upon cases which have dealt with contemporary "occurrence" policies by applying the now largely outdated "accident" rationale. *Diana* is such a case.[18]

We find further support for our analysis in *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 776 P.2d 123 (1989). There,

---

might hit an occupant of the truck." *Butler,* at 401. Accordingly, the court affirmed the trial court's determination on summary judgment that there was no coverage (unless Butler might prevail on his bad faith claim, resulting in the insurer being estopped from asserting the coverage defense). The court did not reach the issue of whether an exclusion clause which excluded coverage for any bodily injury " 'which is expected or intended by any insured or which is the foreseeable result of an act or omission intended by the insured" would also preclude coverage. *Butler,* at 402 n.2. Coverage was also denied to Butler's coinsured spouse because " 'accident' is not a subjective term", *Butler,* 115 Wn.2d at 403 (quoting *Roller,* 115 Wn.2d at 685), so that the perspective of the coinsured spouse was not relevant to the inquiry. Nevertheless, the court appears to have applied a subjective analysis to Butler's claim that the ricochet was an " 'additional unexpected, independent and unforeseen happening' " which brought about the injury. *Butler,* at 401 (quoting *Detweiler v. J.C. Penney Cas. Ins. Co.,* 110 Wn.2d 99, 104, 751 P.2d 282 (1988).

[18]The *Diana* court's continuum analysis was also undermined by its inclusion of cases defining "accident" for the purpose of automobile insurance. *See, e.g., Detweiler; Roller v. Stonewall Ins. Co.,* 55 Wn. App. 758, 780 P.2d 278 (1989), *rev'd,* 115 Wn.2d 679, 801 P.2d 207 (1990). Auto insurance is a whole separate and heavily regulated category of insurance. The definition of "accident" for the purpose of auto insurance is quite different from the definition of "occurrence" for the purpose of comprehensive general liability insurance. "Accident" for the purpose of auto insurance "is not a subjective term. Thus, the perspective of the insured . . . is not a relevant inquiry." *Stonewall,* 115 Wn.2d at 685. *See also*

two insurers sought summary judgment on the issue of coverage where the insured had shot and killed his assailant in self-defense. Both policies were contemporary "occurrence" policies. Our Supreme Court found no public policy reason for denying coverage, in that to intentionally shoot a violent assailant in self-defense is a lawful act. But in this case the language of the policies unambiguously excluded coverage for injuries expected or intended from the standpoint of the insured. There was no serious question that when Brosseau shot the attacker, he expected serious injury or death to occur. Contrary to the arguments of the insurers in the instant appeal, we find no indication that the *Brosseau* majority applied an objective standard to the "expected" issue. We agree with Chief Justice Dore that the "*actual* subjective intent of Brosseau" was the issue. *Brosseau*, at 107 (Dore, J., dissenting). But the *Brosseau* majority clearly stated that in this instance, there was no serious factual question as to that intent.

The insurers argue in this appeal that the subjective standard will result in injustice to insurers, since it is the rare insured who will admit under oath that he or she actually intended or expected the bodily injury or property damage which resulted from an intentional act. We do not find this argument persuasive. In the appropriate cases, the courts will continue to infer such intent and expectation as a matter of law. *E.g.*, *Rodriguez* (incest); *First Farwest* (intentional ingestion of cocaine); *Brosseau* (intentional shooting, even though in self-defense); *Standard Fire Ins. Co. v. Blakeslee*, 54 Wn. App. 1, 771 P.2d 1172 (sexual assault of a patient by a dentist), *review denied*, 113 Wn.2d 1017 (1989).

In cases requiring a trier of fact to determine subjective intent or expectation, we point out that juries routinely determine the credibility of witnesses in courtrooms all over

---

*Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d at 403, in which the court focused on the term "accident" without reference to the term "occurrence".

The insurers in the instant appeal have similarly confused the two types of coverages, perhaps unintentionally in that the courts themselves do not always properly distinguish them. *Diana* was such a case.

this country. Parties will continue to rely upon the collective common sense of jurors, when factual disputes as to subjective intent arise, as they inevitably will, and as they have in this case.

B. Burden of Proof of Subjective Intent and Expectation.

QCF argues that since coverage is *excluded* for insureds who expect or intend bodily injury or property damage to result from their intentional acts, the burden of proof as to that subjective state of mind must lie with the insurers. That the "exclusion" is buried within the coverage clause should make no difference, QCF argues (citing *Aetna Ins. Co. v. Kent*, 12 Wn. App. 442, 530 P.2d 672, *rev'd on other grounds*, 85 Wn.2d 942, 540 P.2d 1383 (1975)). QCF argues that it made a prima facie case for coverage by proving that the property damage resulted from the continuous leakage of pollution from the disposal ponds, citing *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 726 P.2d 439 (1986). We disagree with QCF's interpretation of *E-Z Loader.*

■ We point out first that although exclusionary clauses are to be strictly construed against the insurer and in favor of the insured, *Aetna Ins. Co. v. Kent*, 12 Wn. App. at 447, we are not here "construing" the legal meaning of such a clause; rather we are determining the issue of burden of proof. When an insured establishes a prima facie case giving rise to coverage under the insuring provisions of a policy, the burden is then on the insurer to prove that the loss brought about by an "occurrence" is not covered because of exclusionary provisions in the policy. *Aetna Ins. Co. v. Kent*, 12 Wn. App. at 447.

The case of *Aetna* did not directly address the burden of proof issue, however. It was a case of construction of an exclusionary clause, and QCF's reliance on the case for its position is accordingly misplaced. A better argument was raised by amicus Boeing which pointed out that in *Brosseau*, 113 Wn.2d at 97, our Supreme Court characterized the "expected and intended" clause as "exclusionary". However, our Supreme Court also was not addressing such "exclusion"

in the context of the burden of proof at trial. *Brosseau* was another construction case.

■ The Supreme Court did address burden of proof in *E-Z Loader*, and in the context of a contemporary comprehensive general liability policy. The insurers are correct in their reliance upon *E-Z Loader*. There an insured sought coverage after a jury determined that the insured had engaged in unlawful gender and age discrimination in the discharge of three employees. The jury had been instructed that the employees must prove *intentional* discrimination in order to prevail. After the discrimination trial, E-Z Loader sued its insurers, who had declined coverage. The trial court entered summary judgment in favor of the insurers. The Supreme Court affirmed, in that the "occurrence" policies did not include coverage for intentionally wrongful acts.

> The claim against E-Z Loader would have been covered . . . only if [the employees] had . . . sustained . . . injury . . . neither expected nor intended by the insured. The insured was required to prove the existence of [this element] to recover under the policy.

*E-Z Loader*, at 906.

Although *E-Z Loader* was decided before the Supreme Court's characterization of "intended or expected" as "exclusionary", in *Brosseau*, and although an insurer may not escape its burden of proof by "sandwiching" an exclusion into a clause defining coverage, *cf. Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990); *Dairyland Ins. Co. v. Ward*, 83 Wn.2d 353, 358-59, 517 P.2d 966 (1974), the ruling in *E-Z Loader* is directly on point and disposes of the issue.

Moreover, and particularly in view of our ruling with respect to the subjective-objective issue, we believe that the burden of proof as to an insured's own subjective intent and expectation rightfully should be on the insured. That the insured must bear the burden of proving his or her own subjective state of mind does no violence to our notions of equity and fairness. The burden is not impossible to meet. QCF was able to carry an even heavier burden (both subjec-

tively and objectively) at the trial, and was able to prevail for the policy period up to December 31, 1968.[19]

C. Misrepresentation Defenses: Failure To Timely Tender Return of Premiums.

QCF contends that the trial court erred in allowing Lloyd's and Central National/Highlands to assert their misrepresentation defenses because these insurers failed timely to tender the return of the premiums paid for QCF's coverage. We agree.

Washington law states that "where the insurer claims the policy was never effected due to the insured's fraud or misrepresentation, then as a condition precedent to this defense, the insurer must tender back the premium." *Glandon v. Searle*, 68 Wn.2d 199, 204, 412 P.2d 116 (1966); *see also Neat v. United States Fid. & Guar. Co.*, 170 Wash. 625, 632, 17 P.2d 32 (1932). Furthermore, the insurer is to tender back the premiums at the time the defense of misrepresentation is asserted. *Glandon*, 68 Wn.2d at 204-05.

The insurers argue that *Glandon* and *Neat* do not apply to this case because the insurers do not seek to void the policies; rather, they argue that the policies remain in full force and effect as to the risks they legitimately covered.

The insurers rely on *American States Ins. Co. v. Bresnee*, 49 Wn. App. 642, 745 P.2d 518 (1987). As was true in *Bresnee*, the insurers of QCF charged a lump sum premium rather than a separate premium for each risk covered. In *Bresnee*, garage policies were at issue. The garage policies covered the insureds for liability arising out of their use of insured automobiles, the permissive use of those vehicles by

---

[19]Our view is not universally held. *See, e.g., Clemco Indus. v. Commercial Union Ins. Co.*, 665 F. Supp. 816, 821 (N.D. Cal. 1987) (" 'expected or intended' is in fact an exclusion designed to deny coverage in certain narrow instances"), *aff'd*, 848 F.2d 1242 (9th Cir. 1988). Insurer must prove that insured "engaged in some conscious, calculated *or deliberate act*(s) that directly led to the losses . . .." (Italics ours.) *Clemco*, at 821. This would seem to imply that California would apply both a subjective and objective standard to "intended or expected". If so, the shifting of the burden of proof to the insurer would seem justified. The insurer could then show what a "reasonable person" would have expected. Where that objective standard is legally irrelevant, we believe the burden is more properly placed on the insured.

others and for garage operations. The premiums for the garage policies were fixed by annual audits and were based in part upon the number of employees reported and the value of the vehicles on the automobile inventories. Bresnee, Sr., and Bresnee, Jr., operated separate car lots. Each was separately insured. The cars in their lot inventories were not listed individually in the policies in question.

Bresnee, Sr., had a 17-year-old son, Lance. In August 1984, Lance purchased a 1978 Pontiac Trans-Am with title in his own name. ONB financed the purchase. Bresnee, Jr., cosigned for the loan. Both Bresnee, Sr., and Bresnee, Jr., asked their broker for the garage policies to cover the Pontiac and to confirm coverage to ONB. The broker did so. In the ensuing summary judgment proceedings the broker attested that this request did not seem unusual, in that lenders who finance purchases from car dealers frequently want assurances of coverage on the vehicles they are financing. The 1985 premium audit did not list Lance as an employee at either lot. Nor was the Pontiac included in the vehicle inventory for that year.

In June 1985, while using the Pontiac for nonbusiness purposes, Lance was involved in an accident, injuring himself and several others. The insurers learned the true facts as to the ownership of the Pontiac after the crash. They sought declaratory judgment that the garage policies did not provide coverage for Lance, the Pontiac, Lance's passengers and the injured parties in the other vehicle involved in the crash. Unigard Insurance Company was the uninsured motorist carrier for the other vehicle involved in the crash. The trial court awarded summary judgment to Bresnees' insurers and declined Unigard's motion for reconsideration. Only Unigard appealed. Division Three of this court held that Unigard had standing to appeal.

Among the issues raised by Unigard was whether Bresnees' insurers were required to tender back the premiums paid for the garage policies as a condition of denying coverage for Lance and his Pontiac. Division Three held that no such tender was required because no premium was ever paid for the Pontiac.

This distinguished the case from *General Motors Acceptance Corp. v. Grange Ins. Ass'n*, 38 Wn. App. 6, 684 P.2d 744, *review denied*, 102 Wn.2d 1015 (1984). In that case, an insurer claimed that an automobile policy was never effectuated for a vehicle which was titled in the name of a son, rather than in the name of his father. Insurance premiums were paid to cover the son's car. It was held that tender of the premiums for the son's car was required as a condition precedent to the misrepresentation defense.

*Bresnee* does not apply to the instant matter. In *Bresnee*, no premium was paid for Lance or his Pontiac. Here, premiums were paid for QCF. While the insurers claim on appeal that they would happily tender the premiums for QCF if they could compute the amount with exactitude, they argue that since QCF hasn't done that computation there is no need for the tender. This argument is specious. An insured cannot possibly determine how much of the premium it was required to pay was for a specific entity, absent a breakdown by the carrier or underwriter whose task it is to set the rates. Lloyd's has advised this court that QCF's share of the total premiums paid was de minimus. Central National/ Highlands has provided no information with respect to the amount of its total premiums which was attributable to QCF. If an allocated sum supported by a showing of reasonableness had been tendered, the insurers would have had a persuasive argument. Such was not done and we do not need to decide what would have been necessary to constitute an effective tender on these facts.

The insurers also argue that QCF, which is seeking several millions in excess coverage, would certainly have rejected any such tender of a few paltry thousands of premium dollars. No doubt this is so, but such rejection would not invalidate an otherwise valid tender. Further, a tender into the registry of the court would obviate any such rejection.

More compelling is the insurers' argument, based upon rulings from other jurisdictions, that *Glandon* and *Neat* are contrary to the weight of modern authority. If this

be so, it is for our State Supreme Court, and not for this court, to overrule *Glandon* and *Neat.* Pending any such eventuality, we are bound by those decisions.

In *Neat,* 170 Wash. at 632, the court held that an insurer cannot seek simply to void a part of the policy. The court in that case was referring to an insurer's attempt to void the policy for a period of time (as to the unearned premiums) in a case where the insured had misrepresented his driving record. The insurer claimed this voided the policy, but the insurer tendered only that portion of the premium attributable to the policy period from the date of the accident to the expiration of the policy. Here, we are dealing with excess coverage for one of several subsidiaries of SDC. The reasoning of *Neat* logically applies to the instant case. The insurers cannot be heard to argue that the coverage for QCF was valid for some purposes and not for other purposes. The policy cannot be affirmed in part and rejected in part. The policy cannot be valid and void at the same time. *Neat,* at 632.

█ We hold that Lloyd's tender of the premiums was not timely under *Glandon* and that the tender, if it can be termed as such, by the other carriers contained in the responding insurers' brief for this appeal, is also not timely. Such tender must be made at the time the misrepresentation defense is asserted. *Glandon,* at 204-05.

█ The trial court erred in failing to strike the misrepresentation defenses of Lloyd's and Central National/Highlands.

## IV

### CROSS APPEAL: CONSTRUCTION OF STANDARDIZED QUALIFIED POLLUTION EXCLUSION CLAUSES

The cross-appealing insurers assign error to the trial court's denial of their joint motion for summary judgment of dismissal of QCF's claims, based on the qualified pollution exclusion clauses found in their policies.[20]

---

[20]In the proceedings below, these insurers argued that if they were not entitled to judgment as a matter of law there were factual issues relating to these exclusion clauses which should be decided by the jury. The trial court

The standard pollution exclusion clause found in most of the applicable policies reads as follows:

> This insurance does not apply:
>
> . . . .
>
> (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(Italics ours.)

Coverage under defendant Central National's excess policies involves both the standard pollution exclusion and an exclusion different in language but to the same effect:

> It is agreed that the insurance does not apply to Bodily Injury or Property Damage caused by or resulting from the *discharge of matter* (either during the policy period or prior to its commencement) on or into water, land, air or any other real or personal property; provided, however, that this endorsement shall not exclude insurance with respect to the discharge of matter, if the discharge is *sudden, unexpected, unintentional* and occurs during the policy period following the effective date of this endorsement.
>
> When used in this Endorsement:
>
> (a) *"discharge of matter"* means the emission of matter through its *release, spillage, leakage or by means of dumping, emptying, pumping* or due to failure of any equipment or resulting from any other source or cause whatsoever . . ..

(Italics ours.)

Central National was the excess insurer on three different primary policies, two of which contained the standard pollution exclusion. The exclusion in the third primary policy, which was issued by Safeco, is set forth immediately above. Coverage under the Central National policy depends in part on the coverage afforded in the underlying policies. Therefore, even though the primary carriers have settled the claims against them, the pollution exclusion in Safeco's primary policy must be considered.

---

determined that there were no such factual issues independent of those related to the "occurrence" clauses. On appeal these insurers have taken the position that they must win under the law no matter what the facts may show.

Respondent Maryland Casualty's pollution exclusion clause provides:

> This Insurance does not cover any liability for:
> (1) Personal injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, *provided always that this Paragraph (1) shall not apply* to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, *where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening* during the period of this Insurance.
> (2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances *unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening* during the period of this Insurance.
> (3) Fines, penalties, punitive or exemplary damages.
> This Clause shall not extend this Insurance to cover any liability which would not have been covered under this Insurance had this Clause not been attached.

(Italics ours.)

These insurers argued at trial, as they do for this cross appeal, that there was no "discharge, dispersal, release or escape" of pollutants which was "sudden and accidental" or "sudden, unexpected and unintentional" or "sudden, unintended and unexpected" within the meaning of the clauses above set forth. They argue that this is so because QCF intentionally disposed of liquid toxic wastes into the ponds on its property from at least 1957 to at least 1969. That which was done intentionally can never be an "accident" or "unexpected", the insurers argue, thus focusing upon the *act* of the disposal rather than the *result* of eventual seepage of pollutants into the groundwater.

The insurers also argue that "sudden" must be construed *only* in its temporal connotation, that is, synonymously with "quick" or "immediate" or "instantaneous". The insurers argue that as a matter of law "sudden" cannot mean the exceedingly slow, gradual and continuous leaching of contaminants into the groundwater which took place here, no matter how unexpected that leaching may have been.

These same arguments were heard and rejected by a panel of this court in the case of *United Pac. Ins. Co. v.*

*Van's Westlake Union, Inc.*, 34 Wn. App. 708, 664 P.2d 1262, *review denied*, 100 Wn.2d 1018 (1983). Recognizing that this is so, the insurers request that we reconsider and reject the premises of *Van's Westlake*. By doing so, the insurers argue, we will bring Washington out of the dark ages of environmental and insurance law and into conformity with the modern trend of major cases across the country.

QCF argues that *Van's Westlake*, in which this court construed "sudden" in conformity with the "unexpected" language of the "occurrence" clause, is well reasoned, directly supported by Washington case law, consistent with the rulings of the vast majority of courts around the country and consistent with the intent of the insurance industry as stated by its own Insurance Rating Board and as stated to insurance commissioners all around the country when these pollution exclusion clauses were first promulgated.

Each side has provided the court with citations to cases from across the nation, some of which have construed "sudden" to mean "quick" and some of which have construed "sudden" to mean "unexpected".

In *Van's Westlake*, it was discovered that large quantities of gasoline had leaked out of a small hole in an underground gasoline pipe at a service station in downtown Seattle. When notified of this the municipal authorities promptly closed the station and cordoned off the adjacent several square blocks while the gasoline was pumped out of the ground. The area was closed to traffic for several weeks. A number of businesses made claims for lost profits and similar damages resulting from the closure.

United Pacific Insurance Company had issued a comprehensive general liability insurance policy to the operator of the station. The policy's "occurrence" clause provided coverage for

> an accident, an event, or a continuous or repeated exposure to conditions which results . . . in . . . Property Damage neither expected nor intended by the Insured.

*Van's Westlake*, at 711.

The qualified pollution exclusion clause in United Pacific's policy did not apply if the "discharge, dispersal, release or escape [of pollutants] is sudden and accidental." *Van's Westlake*, at 712.

In company with the majority of courts which had by 1983 construed the standardized qualified pollution exclusion clause, this court found the exclusion clause to be ambiguous, in that the clause is susceptible to two different meanings, either of which is reasonable:

> In the case before us, the liability insurance policy on the one hand covers an "occurrence", which by policy definition includes conditions which are continuing in nature (as the insured argues), while on the other hand the pollution exclusion clause in the policy excludes from coverage damages arising out of the escape of liquids, gases and other substances unless the escape is sudden (as the insurer argues is the situation presented). Both cannot be true yet both positions are reasonable, hence, the policy is ambiguous and requires judicial interpretation. It then follows that ambiguities in the policy are to be construed against the insurer which wrote the policy and in favor of the insured — particularly where an exclusion is involved as it is here. *Witherspoon v. St. Paul Fire & Marine Ins. Co.*, 86 Wn.2d 641, 650, 548 P.2d 302 (1976).

> The form of the insurance policy provisions in question is relatively new. They were substantially changed in an industry-wide revision of standard general liability insurance provisions in 1966, and again in 1973. 3 R. Long, *Liability Insurance* App-30, App-53 (1976). In interpreting such provisions, it is helpful to look at what the insurance underwriters intended when they changed these clauses. *See Weber v. Biddle*, 4 Wn. App. 519, 528, 483 P.2d 155 (1971); *Allegheny Airlines, Inc. v. Forth Corp.*, 663 F.2d 751, 755 (7th Cir. 1981).

> . . . .

> "The term 'occurrence' is generally viewed as providing greater coverage than under the previously used measure 'accident.' " 11 G. Couch, *Insurance* § 44:285, at 437 (2d ed. 1982). One of the principal 1973 revisions in language contained in this policy involved clarification of the word "occurrence" which made it mean an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured. R. Long, at App-53. As noted by this commentator, such "definition should make it clear that occurrence embraces not only the usual accident, but also exposure to conditions which may continue for an unmeasured period of time." R. Long, at App-53. The leak in the insured's

underground gasoline line, which went undetected for a number of months (and during all of which time the policy with this insurer was in effect), was thus an "occurrence" within the contemplation of the policy.

The pollution exclusion was also added by the 1973 standard revisions. The exclusion "eliminates coverage for damages arising out of pollution or contamination, where such damages appear to be expected or intended on the part of the insured and hence are excluded by definition of 'occurrence.'" R. Long, at App-58.

In *Niagara Cy. v. Utica Mut. Ins. Co.*, [103 Misc. 2d 814, 427 N.Y.S.2d 171 (N.Y. Sup. Ct. 1980)], the court had before it the same pollution exclusion clause as in the policy before us (and which clause was required by statute to be a part of liability insurance policies in that state, New York). The court in *Niagara* concluded that "the pollution exclusion was solely meant to deprive active polluters of coverage." *Niagara*, 103 Misc. 2d at 818, 427 N.Y.S.2d at 174. We agree. In the recent case of *Jackson Township Mun. Utils. Auth. v. Hartford Accident & Indem. Co.*, [186 N.J. Super. 156, 451 A.2d 990 (1982)], after reviewing the decisions dealing with the pollution exclusion, the court held that "[w]hen viewed in light of the case law cited, the clause can be interpreted as simply a restatement of the definition of 'occurrence' — that is, that the policy will cover claims where the injury was 'neither expected nor intended.'" *Jackson*, 186 N.J. Super. at 164, 451 A.2d at 994. Again we agree.

. . . .

The insured in the case before us was not an active polluter. The gasoline leaking from a hole in the underground line was not expected or intended, nor was the resulting damage. Thus, the pollution exclusion clause did not exclude coverage for the third party claims and suits against the insured. To hold otherwise would permit the ambiguous pollution exclusion clause to unfairly devour much of the policy and relieve the insurer from liability clearly within the spirit and intendment of the policy.

Since we have concluded that losses such as those which occurred in this case were intended by the underwriters who devised the policy language to be covered by the policy, and were not intended to be excluded, we need not go further and opine as to what "would be understood by the ordinary man buying insurance", see *Witherspoon v. St. Paul Fire & Marine Ins. Co.*, [86 Wn.2d 641, 548 P.2d 302 (1976)] at 650, or expound on what is a "sudden" escape of liquids and gases within the purview of the pollution exclusion, see *Allstate Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (1980).

(Citations omitted.) *Van's Westlake*, at 712-15.

As the insurers point out, *Van's Westlake* has been criticized in some quarters, including the criticism of R. Long upon whose treatise this court had in part relied:

> [The *Van's Westlake* court] found that the exclusion is only designed for liability of active polluters and is only a restatement of the policy definition of "occurrence" with respect to an exception of coverage for intentional acts. This is an unusual and novel interpretation and should not be followed. Coverage should have been found, if at all, because the spill was "sudden and accidental," thereby placing the occurrence outside the scope of the exclusion.

2 R. Long, *Liability Insurance* § 10A.02 (1985).

On the other hand, another commentator has written:

> **The Purpose of the Polluter's Exclusion**
> The standard polluter's exclusion clause, published by the industry in 1970 and incorporated into the revised [comprehensive general liability policy (CGL)] standard-form policy in 1973, excludes coverage for property damage arising from certain discharges of industrial pollutants into the environment, with the explicit exception that the exclusionary clause "does not apply if such discharge . . . is sudden and accidental." The phrase "sudden and accidental" is nowhere defined in the standard CGL, and numerous courts have found it ambiguous.
>
> Many courts have held that the polluter's exclusion was a clarification and restatement of the CGL policies' definition of "occurrence," which excludes coverage for loss that is expected or intended by the insured, and was designed to deny coverage for those who have deliberately polluted the environment. Consistent with the rule that exclusionary clauses in insurance contracts are to be construed narrowly, the majority of courts have rejected the contention that the polluter's exclusion removes coverage for all accidental discharges other than those occurring instantaneously, such as the explosion of a storage tank.
>
> Some commentators have criticized the courts' coverage-promoting interpretation of "sudden and accidental." Their criticism is based on an assumption that the drafters of the language must have intended to exclude coverage for all damages resulting from "gradual pollution." However, the courts' reading of "sudden and accidental" is fully consistent with the interpretation advanced by the rating organizations responsible for developing the exclusion and by the companies that issued policies containing the clause. The records of the rating organizations, the statements filed with state regulators, and internal memoranda and other correspondence publicly disclosed by one of the insurers that took the lead in the effort to

draft standard-form policies, all state explicitly that the polluter's exclusion was intended to be simply a "clarification" of the definition of occurrence and to exclude from coverage any damage from expected or intended pollution.

. . . .

**The State Filings**

In statements made to state insurance regulators in the process of obtaining approval for the original polluter's exclusion in 1970, the rating organizations expressly represented the new endorsement as a clarification of intent to cover unexpected and unintended pollution-caused damage. In a standard explanatory memorandum filed with virtually all the states, the [Insurance Rating Board (IRB)] specifically represented that the new clause merely clarified existing coverage. Some state regulators, such as those in West Virginia, expressed skepticism about these statements and required additional assurances from the industry that the new exclusion was not misleading or deceptive.

Both the [Mutual Insurance Rating Bureau (MIRB)] and the IRB quickly responded that the exclusion continued existing coverage and simply clarified that "expected or intended" pollution — that is, pollution resulting from "willful negligence or irresponsible intent showing a lack of interest in public welfare" — would not be covered. Based on these express representations, West Virginia approved the polluter's exclusion, but only "[t]o the extent that said exclusions are mere clarifications of existing coverages." Similarly, the IRB assured a Georgia state regulator: "The impact of the proposals on the vast majority of risks would be no change. It is rather a situation of clarification . . . . Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued."

(Footnotes omitted.) S. Bradbury, *Original Intent, Revisionism, and the Meaning of the CGL Policies*, 1 Envt'l Claims J. 279, 282-83, 285 (1989).[21]

Certainly the reasoning of *Van's Westlake* has not been uniformly accepted around the nation. Representative of the opposing view is *United States Fid. & Guar. Co. v. Star Fire Coles, Inc.*, 856 F.2d 31, 34 (6th Cir. 1988):

---

[21]A number of courts have considered the history of these clauses in construing their meaning, *e.g., Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989); *Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 745-52, 456 N.W.2d 570, 573-75 (1990); *Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co.*, 218 N.J. Super. 516, 532-34, 528 A.2d 76, 84 (1987).

> We do not find the pollution clause to be riddled with ambiguities despite the best efforts of [the insured] to create them. Specifically, we believe the district court erred when it treated the pollution exclusion and the "occurrence" definition provisions as interchangeable. . . . We have no difficulty reconciling the two provisions. We believe the "occurrence" definition results in a policy that provides coverage for continuous or repeated exposure to conditions causing damages in all cases except those involving pollution, where coverage is limited to those situations where the *discharge* was "sudden [in the temporal sense] and accidental." We fully agree with the conclusion that this "language is clear and plain, something only a lawyer's ingenuity could make ambiguous."

Although the *Van's Westlake* court did not find it necessary to "expound on what is a 'sudden' escape of liquids . . . within the purview of the pollution exclusion" clause, *Van's Westlake*, at 715, other courts have found "sudden" in and of itself to be an ambiguous term. For example, the Georgia Supreme Court has stated:

> Perhaps, the secondary meaning is so common in the vernacular that it is, indeed, difficult to think of "sudden" without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. But, on reflection one realizes that, even in its popular usage, "sudden" does not usually describe the duration of the event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death.

*Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 335, 380 S.E.2d 686, 688 (1989).

Our own Washington Supreme Court has had occasion to construe the meaning of "sudden" in the context of an insurance policy, although not in a pollution exclusion clause. In the case of *Anderson & Middleton Lumber Co. v. Lumbermen's Mut. Cas. Co.*, 53 Wn.2d 404, 333 P.2d 938 (1959), the court was required to construe a boiler and machinery insurance policy when a spoke of a bandsaw wheel was broken. The policy provided coverage if a loss should be caused by an accident, defined as a sudden and accidental breaking of the bandsaw wheel while in operation.

An inspector who examined the wheel opined that the break was caused by metal fatigue which led to a gradual cracking over a period of days or weeks, and finally an

instantaneous breaking. The insurer contended that if this were so, the breaking was not "sudden".

The court agreed with the insurer's analysis of the evidence which showed that the entire breaking process occurred gradually, over a period of time. But that did not resolve the issue of coverage:

> The word "sudden" is defined in Funk & Wagnalls Standard Dictionary of the English Language as, "happening quickly and without warning; coming unexpectedly or in an instant; as *sudden* death; *sudden* dismissal." In Webster's New International Dictionary (2d ed.), it is defined: "Happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for; as, a *sudden* shower, death, emergency, turn for the better, or attack of the enemy."
>
> The purpose of the contract was to insure the respondent against an accidental breakdown of the equipment covered by the policy. The word "sudden" was, of course, placed in the contract for a purpose. Is it more reasonable to assume that it was placed there to show an intent to exclude coverage of a break which did not happen instantaneously, or to exclude coverage of a break which was unforseen and therefore unavoidable? It seems to us that the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time . . . as long as its progress was undetectible. On the other hand, the insured should not be permitted to proceed recklessly and hold the insurer liable for damage if it had been forewarned of a possible break and could have taken steps to forestall it . . ..
>
> . . . We do not . . . construe the word "sudden," [to mean instantaneous] when its primary meaning, in common usage, is not "instantaneous" but rather "unforeseen and unexpected."

*Anderson*, at 408-09.

■■ We find the word "sudden" to be ambiguous in these qualified pollution exclusion clauses now before this court. Not only does "sudden" have more than one popular and ordinary meaning, but we cannot ignore the fact that in one of the policies governing Central National's liability, "discharge of matter" includes "leakage". Leakage which is "sudden, unexpected and unintentional" is covered. Maryland Casualty's clause covers "seepage . . . which is caused by a sudden, unintended and unexpected happening". The words "leakage" and "seepage" (particularly the latter) generally connote a gradual process.

According to *Webster's Third New International Dictionary* 1285 (1986), the verb "leak" means "to enter or escape through a hole . . . usu[ally] by a fault or mistake". "Seepage" is defined as "a draining off by gradual leakage". *Webster's*, at 2056. An event such as "seepage" cannot be both "gradual" and "sudden" in the temporal sense. But an event such as seepage can be both "gradual" and "unexpected". While it is conceivable that a temporally "sudden" happening could lead to "gradual leakage", we are assured by the cross-appealing insurers that all three of the pollution exclusion clauses are to the same effect. We are thus not inclined to find coverage or no coverage under some of the clauses but not as to the others.

In view of the history of these clauses and the representations made by the insurance industry as it sought approval for these pollution exclusion clauses, state by state across the nation, and also because we find the word "sudden" to be susceptible to more than one meaning, we believe that the *Van's Westlake* opinion is correct and essentially sound.[22]

We adhere to the *Van's Westlake* ruling that the standard pollution exclusion clauses are ambiguous and must be construed consistently with the "occurrence" clauses. While we fully understand and agree, as argued by the insurers in this case, that the coverage granted in an occurrence clause may be restricted by an exclusion clause, we cannot ignore the history which indicates that with respect to these standardized qualified pollution exclusion clauses the insurers' intent was to provide coverage for polluters who neither expected nor intended pollution to occur — and that no

---

[22]We do not necessarily agree with *Van's Westlake*'s limitation of the pollution exclusion to "active polluters", however. As was aptly stated by one federal court in *Federal Ins. Co. v. Susquehanna Broadcasting Co.*, 727 F. Supp. 169, 177 (M.D. Pa. 1989), *modified*, 738 F. Supp. 896 (1990), *aff'd*, 928 F.2d 1131 (3d Cir. 1991):

> Insofar as the term "active polluter" is a rubric for analyzing whether coverage exists under the terms of the policy, it is at best unnecessary. If, however, the term imports some additional criteria not found in the policy, it is not part of the parties' contract.

*Susquehanna*, at 177 (quoting *Fireman's Fund Ins. Cos. v. Ex-Cell-O-Corp.*, 702 F. Supp. 1317, 1325 (E.D. Mich. 1988)).

coverage that was provided in the occurrence clauses was being taken away in these pollution exclusion clauses. S. Bradbury, *supra*, 1 Envt'l Claims J. at 285.[23]

We also go further than did the *Van's Westlake* court: the pollution exclusion clauses are not only ambiguous when read in the context of the "occurrence" clauses but also they are internally ambiguous because "sudden" has more than one meaning; and because in two of the clauses before us, the terms "leakage" and "seepage" are difficult if not impossible to reconcile with "sudden" in its temporal connotation.[24]

Because these clauses are ambiguous, and because they are exclusionary clauses, we are required by Washington law to construe them in favor of the insured, and strictly against the insurers. *Van's Westlake*, at 712; *Witherspoon v. St. Paul Fire & Marine Ins. Co.*, 86 Wn.2d 641, 650, 548 P.2d 302 (1976). We hold that the phrases "sudden and accidental", "sudden, unexpected and unintended" and "sudden, unintended and unexpected" in the policies at issue all mean that there is coverage for QCF *unless it expected and intended* the pollution to occur from and after December 31, 1968. That ultimate factual issue will be decided by a jury at the new trial.

█ The trial court correctly ruled that there are no factual issues arising out of the pollution exclusion clauses that differ from the factual issues arising out of the "occurrence" clauses. This conclusion is not altered by the fact that for coverage to exist the escape of the polluting material must be "accidental" as well as "sudden". The insurers argue that since QCF deliberately dumped liquid wastes directly into the gully, and later into the ponds, with

---

[23]Amicus Insurance Association, while not challenging the accuracy of the history referred to by Bradbury, argues that it is inappropriate for this court to consider such "extrinsic evidence". We reject that argument. The construction of these clauses is a question of law and subject to de novo review on appeal.

[24]As previously noted, the cross-appealing insurers have assured this court that although the language in the various policies differs, the clauses are all to the same effect.

no liner or other improvement to stop the eventual escape of the pollutants into the groundwater, they cannot be heard to argue that the escape was "accidental" or "unintended" or "unexpected". In so arguing, the insurers ignore the fact that a jury has already found that prior to December 31, 1968, QCF neither intended nor expected (nor reasonably should have expected) pollution to escape into the groundwater. That jury finding is a verity for purposes of this appeal. Thus, for virtually the entire period during which these wastes were being dumped, there was no expectation or intention that pollution would occur.

That which is unexpected and unintended is "accidental" within the context of these standardized comprehensive general liability "occurrence" policies. 7A J. Appleman, *Insurance* § 4493 (1979). If the insurers are arguing that "accidental" has some other meaning for purposes of the exclusion clauses, we reject such argument.

The insurers rely upon *Technicon Elecs. Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989) for the proposition that QCF's deliberate act (dumping of wastes into the gully and into the ponds) cannot be "accidental" as a matter of law. In *Technicon* the insured deliberately dumped wastes directly into a creek and then claimed it had not "intended" the resulting pollution damage downstream. We have no difficulty in agreeing with the New York court that the resulting pollution in *Technicon* was not "accidental" as a matter of law.

The insurers argue that we should also adopt the reasoning of *Technicon* that

> the pollution exclusion clause, by its own terms, does not distinguish between intended or unintended consequences of intentional discharges; rather, it excludes from coverage liability based on all *intentional* discharges of waste whether consequential damages were intended or unintended.

*Technicon*, 74 N.Y.2d at 75.

The insurers argue that this means courts should focus not on the resulting damage but rather on the polluting event — here, the dumping of the wastes into QCF's ponds.

The quotation from *Technicon* provided to this court by the insurers is set forth above. To fully understand the statement, however, one needs to read the rest of the same paragraph:

> If the discharge was intentional, the disqualifying exclusion clause is operative and there is no coverage because the exception clause lacks its springboard. Inasmuch as the underlying complaint alleges and Technicon's answer concedes that its dumping of wastes was deliberate, the occurrence cannot be "accidental" within the meaning of the policy. To accept Technicon's interpretation of the pollution exclusion clause would otherwise render that clause meaningless *in context.*

(Italics ours.) *Technicon,* 74 N.Y.2d at 75.

The "context" of *Technicon,* of course, was the intentional dumping of pollutants directly into a stream. Unlike the insured in *Technicon,* here QCF does reach the "springboard" to the exception clause, subject to a jury determining at the new trial whether QCF expected and intended the pollutants to escape from the ponds into the groundwater from January 1, 1969, to March 11, 1983 (the periods of coverage at issue for purposes of this cross appeal). As has been stated by Judge James M. Havey, the author of *Jackson Township Mun. Utils. Auth. v. Hartford Accident & Indem. Co.,* 186 N.J. Super. 156, 451 A.2d 990 (1982), *cited in Van's Westlake,* at 712, in a subsequent writing:

> It is too simplistic a solution to say that the pollution exclusion clause is ambiguous and, therefore, inapplicable to the typical groundwater pollution case. Examination must be made of the allegations in the underlying complaint against [an insured] to determine the nature of the activity for which he is asked to be held accountable.

J. Havey, *Insurance Coverage in Groundwater Pollution Litigation,* N.J. Law 18, 19 (1983).

We do not disagree with the above statement. In a very real sense the "underlying complaint" against QCF is CERCLA, which provides for strict liability rather than liability based on fault or negligence. But in the context of these insurance coverage questions now on appeal the "underlying complaint" is that QCF between 1957 and 1969 without

intending to pollute and without expecting to pollute poured wastes first into a gully and subsequently into ponds which became lined with a tarlike sludge which appeared to contain most of the unburned waste. We cannot equate that conduct, as a matter of law, with deliberately dumping waste directly into a creek as occurred in *Technicon*.

Finally, we address the arguments of amicus Insurance Association that for this court to affirm the summary judgment of the trial court with respect to these pollution exclusion clauses will not serve the public policy purposes of CERCLA, *i.e.*, will not provide incentives for polluters to self-regulate. We are further warned by amicus Insurance Association that if we do not reject *Van's Westlake*, insurance companies will be

> forced to stop writing policies for defined pollution coverage, thus denying members of the public the opportunity to obtain coverage for truly "sudden and accidental" mishaps.

Brief of amicus Insurance Association, at 5.

We point out that it is not the task of this court to construe CERCLA; rather it is our task to construe the standardized qualified pollution exclusion clauses which are before us in this case. Those clauses are ambiguous. Those clauses were drafted by the insurance industry with full knowledge that courts will turn to standard dictionaries in order to construe terms which are not otherwise defined in the policies themselves. If the insurance industry had intended "sudden" to mean only "instantaneous" as opposed to "unexpected" it would have been a simple matter to insert a clause so stating (or even more simply to substitute the word "instantaneous" for the inherently ambiguous word "sudden").

Moreover, we do not accept the proposition that judicial rulings are the reason that pollution coverage is unavailable in policies being issued today. Rather, CERCLA is the reason. "In fact, since the enactment of CERCLA, pollution insurance has become unavailable in any insurance market."

*Boeing*, 113 Wn.2d at 911 (Callow, C.J., dissenting). This is so because

> [t]he innovative new features of CERCLA's liability scheme simply prevent insurers from calculating and charging premiums that bear any real relation to the risk of CERCLA liability.

*Boeing*, 113 Wn.2d at 907 (Callow, C.J., dissenting).

We recognize and even sympathize with the dismay of insurers who issued "occurrence" (as opposed to "claims made") policies many years ago without advance knowledge that in 1980 Congress would enact CERCLA and impose retroactive liability upon insureds who had "disposed of hazardous waste in a completely legal, nonactionable manner". *Boeing*, 113 Wn.2d at 907 (Callow, C.J., dissenting). But our Supreme Court has rejected these same public policy arguments as we are now hearing, in *Boeing*. Our Supreme Court has declined to "rewrite the principles of insurance contract analysis in Washington, and then to retroactively apply these rewritten principles to the policyholders that bought their policies decades ago." *Boeing*, 113 Wn.2d at 887.

## CONCLUSION

The trial court's order of dismissal is reversed and this matter is remanded for a new trial on the issue of QCF's intent and actual, subjective expectation that contaminants would leak from its disposal ponds into groundwater after December 31, 1968, and before March 11, 1981. The trial court's ruling that the cross-appealing insurers are not entitled to summary judgment of dismissal as a matter of law based on the qualified pollution exclusion clauses is affirmed. The jury's finding at the new trial as to QCF's intent and actual, subjective expectation will govern both as to coverage under the "occurrence" clauses and with respect to the applicability of the exception to the pollution exclusion clauses.

At the new trial, Central National/Highlands' misrepresentation defense shall be stricken. We also remand for

entry of judgment that Lloyd's is obligated to provide coverage under its policies.

COLEMAN and FORREST, JJ., concur.

After modification, further reconsideration denied June 11, 1992.

Review granted at 120 Wn.2d 1025 (1993).