USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1721 ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff-Appellee, v. WARWICK DYEING CORPORATION, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ ____________________ Before Torruella, Cyr and Boudin, Circuit Judges. ______________ _____________________ Thomas M. Reiter with whom David M. Jones, John M. Edwards, _________________ ______________ _______________ Linda E. Presson, Kirkpatrick & Lockhart, Nicholas Gorham, __________________ ________________________ ________________ Edmund L. Alves II and Gorham & Gorham were on brief for ___________________ _________________ appellant. Michael Rubin, Assistant Attorney General and Environmental _____________ Advocate, Office of the Attorney General, and Jeffrey B. Pine, ________________ Attorney General of Rhode Island, on brief for State of Rhode Island, amicus curiae. Louis V. Jackvony III on brief for Town of North Smithfield, _____________________ amicus curiae. John F. Bomster, John A. Tarantino, W. James McKay, _________________ ____________________ ________________ Victoria M. Almeida, W. Mark Russo, Sherry A. Giarrusso, Adler ___________________ ______________ ____________________ _____ Pollock & Sheehan Incorporated and Andrew C. Spacone on brief for ______________________________ _________________ Textron, Inc., amicus curiae. Kimball Ann Lane with whom Craig R. Brown, Anne T. Turilli, _________________ ______________ _______________ Julie B. Pollack, Roger D. Brown, Adams, Duque & Hazeltine, _________________ _______________ __________________________ James T. Murphy and Hanson, Curran, Parks & Whitman were on brief _______________ _______________________________ for appellee. -2- Laura A. Foggan, Lon A. Berk, Celiza P. Braganca and Wiley, ________________ ___________ __________________ ______ Rein & Fielding on brief for Insurance Environmental Litigation ________________ Association, amicus curiae. ____________________ June 22, 1994 ____________________ -3- TORRUELLA, Circuit Judge. This case concerns the oft- _____________ litigated pollution exclusion clause commonly found in general liability insurance policies. Insurance coverage under this clause, or the lack thereof, has engendered bitter and frequent disputes between insurance companies and policyholders facing some form of environmental liability. We enter the fray secure in the knowledge that, regardless of our holding, we will have followed a sizeable number of the courts that have considered the issue. Upon our own consideration of the pollution exclusion clause as applied to the specific facts of this case, we cast our lot with those courts narrowly construing the breadth of coverage afforded under the clause. We thus affirm the district court's order of summary judgment in favor of plaintiff-appellee. I. BACKGROUND I. BACKGROUND Plaintiff-appellee, St. Paul Fire and Marine Insurance Company ("St. Paul"), brought this action in the district court to obtain a declaratory judgment that St. Paul had no obligation under an insurance contract issued to the defendant, Warwick Dyeing Corporation ("Warwick"), to defend or indemnify Warwick for claims arising from environmental damages at the Landfill & Resource Recovery Superfund Site in North Smithfield, Rhode Island (the "L&RR landfill" or the "Site"). St. Paul asserted in its complaint that, among other things, the pollution exclusion clause of the insurance policy barred coverage for contamination at the L&RR landfill after Warwick arranged for the disposal of its waste materials at the Site. -3- A. The Claims A. The Claims __________ Warwick is in the business of dyeing, finishing and coating synthetic and synthetic-natural fiber blend fabrics. In July of 1979, Warwick hired ACME Services, Inc. ("ACME"), a duly licensed waste hauler, to collect, haul away, and dispose of various waste materials generated by Warwick's West Warwick plant. The waste contained certain hazardous substances. ACME hauled the waste to the L&RR Site, also duly licensed, and disposed of it in the landfill. One ACME truck driver stated in an affidavit that he discharged waste directly into the landfill by opening a drain valve on his truck and letting the waste pour onto the ground. There is no evidence, however, that Warwick knew where or how ACME disposed of its waste materials. Furthermore, no party or governmental agency has alleged that Warwick or ACME improperly discharged Warwick's waste materials. On September 18, 1989, the United States Environmental Protection Agency ("EPA") notified Warwick that it had determined Warwick was a "potentially responsible party" ("PRP") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et seq., with respect to _______ contamination at the L&RR Site. The EPA stated that the L&RR Site experienced releases and threatened releases of hazardous substances requiring the EPA to undertake cleanup activities for which the PRP's could be held liable pursuant to Sections 104, 106(a) and 107(a) of CERCLA. 42 U.S.C. 9604, 9606(a) & 9607(a). -4- The EPA noted that "responsible parties" include "persons who arranged for disposal of hazardous substances found at the site." Under CERCLA, a person that generates hazardous substances and arranges for their disposal is strictly liable, ________ ______ regardless of whether the person was at fault or whether the substance actually caused or contributed to any damage, for all costs of remediating environmental damages at the site where the substances ultimately are disposed. See Dedham Water Co. v. ___ _________________ Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1150-56 (1st Cir. _____________________________ 1989); O'Neil v. Picillo, 883 F.2d 176, 177-83 (1st Cir. 1989), ______ _______ cert. denied, 493 U.S. 1071 (1990). ____ ______ The EPA alleged that Warwick was a "responsible party" at the L&RR Site because it had arranged, "by contract agreement, or otherwise," for the "disposal" of hazardous substances at the L&RR Site. The EPA demanded reimbursement of the response costs, mainly for investigation and monitoring, that it had incurred and planned to incur at the Site. On June 29, 1990, the EPA issued an administrative order, pursuant to 104(e) & 106(a) of CERCLA, 42 U.S.C. 9604(e) & 9606(a), against twenty five respondents, including Warwick, demanding that the respondents perform certain remedial activities at the L&RR Site. The order alleged that Warwick "arranged for the disposal of water soluble dye and fibers containing acids and VOCS [volatile organic compounds], which were disposed of at the Site." According to the EPA, the hazardous substances at the L&RR Site had been poured directly -5- into the landfill or deposited in drums into the landfill. The EPA's order documented the results of an investigation showing that "the landfill continues to release Hazardous Substances to the environment." The EPA made no allegations, however, that waste was improperly disposed of or discharged at the Site or that the landfill was improperly maintained. In fact, no specific cause of the contamination was mentioned beyond the fact that the named respondents disposed of waste at the Site. The EPA ordered that respondents undertake various remedial activities to monitor and prevent the further release of hazardous substances and to reimburse the EPA for its previous and future actions at the Site. On July 25, 1991, a group of fourteen plaintiffs that were also named by the EPA as PRPs at the L&RR Site filed suit against Warwick and forty-six others for recovery of past and future response costs incurred at the Site. The suit asserted that Warwick was jointly and severally liable for having "arranged for the disposal of hazardous substances" at the site. Subsequent to the filing of this suit, Warwick entered into a settlement agreement with the plaintiffs under which Warwick paid $40,000 and assigned its rights under the St. Paul insurance policies to the plaintiffs. During the EPA's actions and the private lawsuit, Warwick notified St. Paul, its general liability insurance carrier, that it was seeking defense costs, and possibly, indemnity coverage for the claims made by the EPA and the private -6- plaintiffs. St. Paul denied that coverage existed under the applicable insurance policies for the claims against Warwick and eventually brought this action to obtain an enforceable declaration of noncoverage. B. The Insurance Contract B. The Insurance Contract ______________________ St. Paul issued a series of "Comprehensive General Liability Policies" ("CGL" policies) to Warwick that provided Warwick with continuous coverage from 1971 through 1985 for general commercial risks. The insurance policies provided: The Company [St.Paul] will pay on behalf of the Insured [Warwick] all sums which the Insured shall become legally obligated to pay as damages because of: Coverage A.: bodily injury or Coverage B.: property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage even if any of the allegations of the suit are groundless, false or fraudulent, . . . The policies thus provided coverage for property damage caused by an "occurrence" which the policies defined as: an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured. Following this insuring clause was a list of exclusions from coverage, including the pollution exclusion at issue here (the "exclusion"). Although the policies varied from year to -7- year, the following is representative of the language of the exclusion: It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water. The exclusion contained an exception (the "exception") which stated: This exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental. St. Paul filed its action on January 27, 1991. In response to motions for summary judgment made by both parties, the federal magistrate recommended that the district court enter a judgment in favor of St. Paul. The magistrate held that the pollution exclusion barred coverage for Warwick's claims because the discharge of pollutants at the L&RR Site was neither "sudden" nor "accidental" as required by the exception to the exclusion. The district court initially issued an order on March 18, 1993, adopting this recommendation. On the same day, Warwick moved for reconsideration in light of "newly discovered evidence" regarding representations made to state insurance regulatory authorities about the meaning of the pollution exclusion clause. The district court responded by recalling its order and vacating the judgment. After additional briefing, however, the court again adopted the magistrate's recommendation and, on June 4, 1993, -8- entered a judgment for St. Paul. II. CONSTRUCTION OF THE INSURANCE CONTRACT II. CONSTRUCTION OF THE INSURANCE CONTRACT We review the district court's interpretation of St. Paul's insurance contract de novo, LaSorsa v. Unum Life Ins. Co., _______ __________________ 955 F.2d 140, 146 (1st Cir. 1992); CPC Int'l, Inc. v. Northbrook _______________ __________ Excess & Surplus Ins. Co., 962 F.2d 77, 91 (1st Cir. 1992), to __________________________ determine if Warwick's claims are excluded from coverage as a matter of law. Rhode Island law governs the construction of the insurance policy in this case. To interpret contested terms of an insurance policy under Rhode Island law, the "policy must be examined in its entirety and the words used must be given their plain everyday meaning." McGowan v. Connecticut Gen. Life Ins. _______ __________________________ Co., 289 A.2d 428, 429 (R.I. 1972); see also Textron, Inc. v. ___ ________ _____________ Aetna Casualty and Surety Co., 638 A.2d 537, 539 (R.I. 1994); ______________________________ Malo v. Aetna Casualty and Surety Co., 459 A.2d 954, 956 (R.I. ____ ______________________________ 1983). "[W]hen the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end. The contract terms must be applied as written and the parties bound by them." Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 551 ____________________ _________ (R.I. 1990) (citing Malo, 459 A.2d at 956); Hughes v. American ____ ______ ________ Universal Ins. Co., 423 A.2d 1171, 1173 (R.I. 1980). Language ___________________ that is found to be ambiguous or capable of more than one reasonable interpretation will be construed liberally in favor of the insured and strictly against the insurer. Bartlett v. Amica ________ _____ Mut. Ins. Co., 593 A.2d 45, 47 (R.I. 1991) (citing Streicker, 583 _____________ _________ -9- A.2d at 552); Pressman v. Aetna Casualty and Surety Co., 574 A.2d ________ _____________________________ 757, 759-60 (R.I. 1990). However, a "policy is not to be described as ambiguous because a word is viewed in isolation or a phrase is taken out of context. A court should not, through an effort to seek out ambiguity when there is no ambiguity, make an insurer assume a liability not imposed by the policy." McGowan, _______ 289 A.2d at 429; see also Textron, 638 A.2d at 539, 541; ________ _______ Bartlett, 593 A.2d at 47; Streicker, 583 A.2d at 552. ________ _________ To our knowledge, no Rhode Island court has interpreted or discussed the pollution exclusion clause at issue in this case. We therefore decide this case according to the aforementioned principles of contract construction under Rhode Island law with guidance from the collected wisdom of other courts applying similar principles of insurance contract interpretation. Finally, although the parties agree that insurance companies bear the burden of proving that a policy exclusion bars coverage of a claim, the parties disagree over who bears the burden of proving whether or not an exception to the exclusion, such as the "sudden and accidental" exception at issue here, affords coverage in a particular case. Warwick argues that because the exception is part of the exclusionary clause, St. Paul must prove that the exception applies as well. See New ___ ___ Castle County v. Hartford Accident & Indemnity Co, 933 F.2d 1162, _____________ ________________________________ 1182 (3d Cir. 1991) (finding that the burden of proof is on the insurer under Delaware law), cert. denied, 113 S. Ct. 1846 ____ ______ -10- (1993). The last time we considered this issue, we stated that the insured bears the burden of establishing that an exception to _______ a pollution exclusion provision has been satisfied. A. Johnson & ____________ Co. v. Aetna Casualty & Surety Co., 933 F.2d 66, 76 n.14 (1st ___ _____________________________ Cir. 1991) (citing 19 G. Couch, Couch on Insurance 79: 385 (2d ____________________________ ed. 1983)) (applying Maine law). We think that the Supreme Court of Rhode Island would agree with our position in A. Johnson. Once the insurer has ___________ established that the pollution exclusion applies, coverage depends on the applicability of the exception. Because the insured bears the burden of establishing coverage under an _______ insurance policy, it makes sense that the insured must also prove that the exception affords coverage after an exclusion is triggered. Northern Insurance Co. v. Aardvark Assocs., Inc., 942 ______________________ ______________________ F.2d 189, 194-95 (3d Cir. 1991); Fireman's Fund Ins. Cos. v. Ex- ________________________ ___ Cell-O Corp., 702 F. Supp. 1317, 1328-29 (E.D.Mich. 1988); Borg- ____________ _____ Warner Corp. v. Insurance Co. of N. Am., 577 N.Y.S.2d 953, 957 ____________ ________________________ (N.Y. App. Div. 1992). We find, therefore, that Warwick bears the burden of establishing that the discharge of its waste was "sudden and accidental" under the exception to the pollution exclusion. III. THE POLLUTION EXCLUSION III. THE POLLUTION EXCLUSION The pollution exclusion clause of the St. Paul-Warwick insurance policies bars coverage for "property damage arising out -11- of the discharge, dispersal, release or escape"1 of pollutants of waste materials unless the discharge is "sudden and ___________ accidental" (emphasis added). The issue before us is whether the __________ district court erred in finding that the discharge of Warwick's wastes at the L&RR landfill was neither sudden nor accidental and thus not covered under the policies. State and federal courts are fairly evenly divided over the meaning and application of the "sudden and accidental" exception to the pollution exclusion clause. See, e.g., CPC ___ ____ ___ Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 962 F.2d 77, ___________ ____________________________________ 92 (1st Cir. 1992) (reprinting two footnotes from New Castle, 933 __________ F.2d at 1195, listing 24 cases holding that the pollution clause bars coverage and 26 cases holding the opposite).2 Most courts part company on the issue of whether the term "sudden" is ambiguous -- in which case the policy is construed in the insured's favor to provide coverage -- or unambiguous, in which case insurance coverage is usually barred. Because most cases involve some kind of gradual release of pollutants into the environment over an extended period of time, courts finding a bar to coverage under the exclusion have construed "sudden" as ____________________ 1 We hereinafter employ the term "discharge" to refer to the phrase, "discharge, dispersal, release or escape" in the pollution exclusion. 2 Amicus for St. Paul, Insurance Environmental Litigation ______ Association, provides a list of 74 state and federal cases holding that the term "sudden" in the pollution exclusion clause clearly has a temporal meaning that favors insurers. We do not doubt for a minute that there are another 74 cases holding that the term is ambiguous, which favors the insureds. -12- unambiguously meaning "abrupt" or "immediate." E.g., Hartford ____ ________ Accident & Indem. Co. v. U.S. Fidelity & Guar. Co., 962 F.2d ______________________ ___________________________ 1484, 1487-90 (10th Cir.), cert. denied, 113 S. Ct. 411 (1992); ____ ______ Aetna Casualty & Surety Co. v. General Dynamics Corp., 968 F.2d ____________________________ ______________________ 707, 710 (8th Cir. 1992); A. Johnson, 933 F.2d at 72-74; ___________ Aardvark, 942 F.2d at 191-94; Ogden Corp. v. Travelers Indemnity ________ ___________ ___________________ Co., 924 F.2d 39, 42 (2d Cir. 1991); FL Aerospace v. Aetna ___ ____________ _____ Casualty & Surety Co., 897 F.2d 214, 219 (6th Cir.), cert. _______________________ ____ denied, 498 U.S. 911 (1990); Dimmitt Chevrolet, Inc. v. ______ __________________________ Southeastern Fidelity Ins. Corp., No. 78293, 1993 WL 241520, at _________________________________ *1-5 (Fla. July 1, 1993); Hybud Equip. Corp. v. Sphere Drake Ins. __________________ _________________ Co., 597 N.E.2d 1096, 1100-03 (Ohio 1992), cert. denied, 113 S. ___ ____ ______ Ct. 1585 (1993); Upjohn Co. v. New Hampshire Ins. Co., 476 N.W.2d __________ ______________________ 392 (Mich. 1991); Lumbermens Mutual Casualty Co. v. Belleville _______________________________ __________ Industries, Inc., 555 N.E.2d 568, 572-73 (Mass. 1990); Waste _________________ _____ Management of Carolinas, Inc. v. Peerless Ins. Co., 340 S.E.2d ______________________________ __________________ 374, 381-83 (N.C. 1986); Borg-Warner, 577 N.Y.S.2d at 957; Mays ___________ ____ v. Transamerica Ins. Co., 799 P.2d 653, 657 (Or. App. 1990). ______________________ Courts construing the exception to the exclusion as affording coverage for gradual discharges of pollutants have found that "sudden" could reasonably mean "unintended and unexpected." E.g., New Castle, 933 F.2d at 1193-1203; Morton Int'l, Inc. v. ____ __________ ___________________ General Accident Ins. Co., 629 A.2d 831, 847-876 (N.J. 1993); __________________________ Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, ______________________ _____________________ 1210, 1217-21 (Ill. 1992); Hecla Mining Co. v. New Hampshire Ins. ________________ __________________ Co., 811 P.2d 1083, 1091-92 (Colo. 1991); Claussen v. Aetna ___ ________ _____ -13- Casualty & Surety Co., 380 S.E.2d 686, 688-89 (Ga. 1989). Even ______________________ this Circuit has split over the meaning of "sudden and accidental" in the application of different state laws. Compare _______ CPC Int'l, 962 F.2d at 91-98 (finding "sudden" ambiguous), with __________ ____ Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 938 F.2d ____________________________ _______________________ 1423, 1429-30 (1st Cir. 1991) (finding "sudden" unambiguous), cert. denied, 112 S. Ct. 969 (1992); A. Johnson, 933 F.2d at 72- ____ ______ __________ 74 (same); Great Lakes Container Corp. v. National Union Fire ____________________________ ____________________ Ins. Co., 727 F.2d 30, 33-34 (1st Cir. 1984) (same). ________ This case, however, can be decided without determining whether "sudden" is ambiguous or unambiguous. Despite the deep divisions in their holdings, almost all courts agree, and the parties to this case agree as well, that the term "sudden and accidental," means, at the very least, "unintended and unexpected." E.g., CPC Int'l, 962 F.2d at 91-98; Hartford, 962 ____ __________ ________ F.2d at 1488; New Castle, 933 F.2d at 1192-99; Upjohn, 476 N.W.2d __________ ______ at 392; Hecla, 811 P.2d at 1091-92. In other words, intentional _____ and expected discharges of pollutants are not covered under policies with the standard pollution exclusion. Because we agree with the district court that the discharge of pollutants was not unintended and unexpected in this case, we uphold the summary judgment order on that ground without reaching the issue of whether the term "sudden," as used in the policy, is ambiguous. Certain facts of this case are not in dispute. Warwick purposefully arranged to have its waste materials collected and hauled off its property. Those materials were disposed of in the -14- L&RR landfill. At the same time, Warwick presumed that its wastes were disposed of lawfully and properly. It neither expected nor intended that contamination of the environment would result from the disposal of its wastes. The district court found that Warwick's arrangement for ACME to dispose of its waste in the regular course of business was sufficient to establish that the relevant discharge was "intentional and expected" and thus not "accidental." On appeal, Warwick argues that the district court erred in attributing Warwick's act of generating the waste and arranging for its disposal with ACME's act of discharging the waste at the L&RR Site. Additionally, Warwick contends that the court erred in finding the relevant discharge to be the disposal of waste at the landfill instead of the subsequent escape of pollutants from the landfill into the surrounding environment. We reject both arguments. A. Arranging for discharge versus making the discharge A. Arranging for discharge versus making the discharge ___________________________________________________ Warwick maintains that the pollution exclusion does not apply when the discharges are made by a third party, such as a waste hauler like ACME. Rather, Warwick argues, the relevant discharge must be one by the insured itself. Because ACME, and not Warwick, discharged this waste in this case, Warwick concludes that no discharge has occurred that would trigger the pollution exclusion to begin with. This argument has previously been rejected by a number of courts. See Aardvark, 942 F.2d at ___ ________ 194; United States Fidelity & Guar. Co. v. George W. Whitesides ___________________________________ _____________________ -15- Co., 932 F.2d 1169, 1170-71 (6th Cir. 1991); Polaroid Corp. v. ___ ______________ Travelers Indem. Co., 610 N.E.2d 912, 916 (Mass. 1993); Powers _____________________ ______ Chemco, Inc. v. Federal Ins. Co., 548 N.E.2d 1301, 1302 (N.Y. ____________ _________________ 1989); Borg-Warner, 577 N.Y.S.2d at 958; see also A. Johnson, 933 ___________ ________ __________ F.2d at 72 n.9 (noting that the pollution exclusion "does not by its terms take account of an insured's status as a passive polluter"). While it is true that the act of arranging for a third party to haul away one's waste is not in and of itself any kind of discharge upon land, that fact is irrelevant to the question of whether the discharge from which the pollution damage arose was expected or intended. The plain and unambiguous language of the pollution exclusion concerns "property damage arising out of the discharge," not "its discharge" or "the insured's discharge." ___ ___ _________ We thus see nothing in the policy to indicate that the exclusion is limited to discharges by the insured. See, e.g., Park-Ohio ___ ____ _________ Indus., Inc. v. Home Indemnity Co., 975 F.2d 1215, 1222 (6th Cir. ____________ __________________ 1992); Aardvark, 942 F.2d at 194; Borg-Warner, 577 N.Y.S.2d at ________ ___________ 958. Contrary to Warwick's assertions, there is no meaningful distinction in this case between arranging for waste to be hauled off for disposal and actually disposing of the waste in a landfill. For purposes of the exclusion, neither action was unexpected or unintended by Warwick.3 Although Warwick did not ____________________ 3 There is strong disagreement among the parties and, not surprisingly, among the courts, over the issue of whether the discharge must be unintended and unexpected from the standpoint -16- know the particular site where its waste would be disposed, and, indeed, the record does not reveal whether Warwick actually knew that its waste would be deposited in a landfill to begin with (presumably, Warwick intended and expected that its wastes were being "taken care of" without knowing any specific details of their disposal),4 we think this case provides every indication that the disposal of waste in the L&RR landfill was, at the very least, not unexpected or unintended. ___ ________________________ The relevant inquiry is not confined to whether Warwick actually knew or planned that the discharge would occur. Instead, the relevant inquiry, according to the language of the exception to the pollution exclusion -- "this exclusion does not ____________________ of the insured or from the standpoint of some other party who is more closely connected to the actual discharge of the waste. As this issue does not affect our holding, we proceed under the assumption that the relevant point of view is that of the insured, Warwick. We do not decide, however, whether this is in fact the proper construction of the contract. 4 In a September 14, 1988, letter to the EPA, Warwick's President stated: "It was believed by the writer that the liquid waste was to be carried to a waster-water [sic] sewage treatment facility since the waste was acceptable to the West Warwick Sewer System." The language of this statement indicates that Warwick never bothered to find out, or even to inquire about, where its waste was going. It does not indicate that Warwick was told that ACME would bring its waste to a sewage treatment facility or that disposing of its waste in a landfill was against Warwick's intentions. Moreover, this statement indicates that Warwick did not intend for its waste to be handled in any particular fashion beyond merely dumping it down the sewer. Notations on the L&RR manifests, recording ACME's disposal of Warwick's waste at the landfill, state that, "this product normally goes to [the] sewer. This is the sludge that collects on the bottom [of Warwick's waste pit]." The disposal of the waste into a landfill was consistent with Warwick's normal treatment of the waste -- a general disposal into the normal sanitation infrastructure. In light of this fact, ACME's discharge of Warwick's waste into the landfill could not be viewed as unexpected or unintended. -17- apply if such discharge . . . is sudden and accidental" -- is whether the discharge is "accidental," meaning "unexpected or unintended." Coverage is only afforded if the discharge is neither expected nor intended. "The courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen." Aetna Casualty ______________ & Surety Co. v. General Dynamics Corp., 968 F.2d 707, 710 (8th _____________ _______________________ Cir. 1992) (quoting St. Paul Fire & Marine Ins. Co. v. Northern ________________________________ ________ Grain Co., 365 F.2d 361, 364 (8th Cir. 1966)). _________ We think it would strain common sense to find that ACME's disposal of Warwick's waste in a landfill was unexpected or unintended by Warwick. A landfill is a sufficiently common, if not likely, destination for the disposal of waste. We see no error in presuming that a party arranging to have its waste disposed of by a licensed hauler would not find it fortuitous, unforeseen, unusual, or otherwise contrary to its expectations that its waste was disposed of at a landfill. This is not a case where ACME did something surprising or out of the ordinary with the waste after collecting it from Warwick. ACME did not dump the waste in a river or at an illegal dumping ground. Despite the affidavit from an ACME driver stating that waste was poured directly onto the ground, the EPA and private party suits against Warwick allege no wrongdoing or improper dumping at the Site. The essence of the EPA's letter and order is that the property damage at the Site arose as a result of hazardous substances -18- being placed in the landfill to begin with; there is no intermediate event of discharge that Warwick can point to as being unexpected or unintended from its standpoint. B. The Relevant Discharge at the L&RR Landfill B. The Relevant Discharge at the L&RR Landfill ___________________________________________ Warwick argues that even if the disposal of its wastes at the L&RR Site was intended and expected, this was not the relevant discharge under the pollution exclusion clause. Warwick claims that after the disposal of its waste, some subsequent unexpected and unintended release of hazardous substances at the Site occurred which led to the damage in this case. The issue of whether the proper object of Warwick's intentions and expectations is the disposal of waste materials at the Site or some other discharge of pollutants is resolved by reference to the contract. The language of the pollution exclusion is clear that coverage does not exist for "property damage arising out of the discharge" of waste materials or other pollutants "into or _________ upon land" unless "such discharge . . . is sudden and _________ accidental." Clearly, the occurrence that must be sudden and accidental -- or, for our purposes, unintentional and unexpected -- is the discharge of pollutants "into or upon land" from which the property damage arose. It is well established that whether the damages were _______ intended or expected is irrelevant; the pollution exclusion plainly refers to the discharge and not to the environmental damages themselves. A. Johnson, 933 F.2d at 72 (1st Cir. 1991); __________ Patz v. St. Paul Fire & Marine Ins. Co., No. 93-2135, 1994 WL ____ _________________________________ -19- 27280 (7th Cir. Feb. 2, 1994); Anaconda Minerals Co. v. Stoller _____________________ _______ Chemical Co., 990 F.2d 1175, 1179 (10th Cir. 1993); Liberty _____________ _______ Mutual Ins. Co. v. Triangle Industries, Inc., 957 F.2d 1153, ________________ __________________________ 1157-58 (4th Cir.), cert. denied, 113 S. Ct. 78 (1992); Broderick ____ ______ _________ Investment Co. v. Hartford Accident & Indem. Co., 954 F.2d 601, ______________ _______________________________ 606-07 (10th Cir.), cert. denied, 113 S. Ct. 189 (1992); New ____ ______ ___ Castle, 933 F.2d at 1169, 1199-1202 & n.68; Morton Int'l, Inc. v. ______ __________________ General Accident Ins. Co., 629 A.2d 831, 847-48 (N.J. 1993); ___________________________ Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc., _______________________________ ____________________________ 555 N.E.2d 568, 571 (Mass. 1990); Technicon Electronics Corp. v. ___________________________ American Home Assurance Co., 542 N.E.2d 1048, 1050-51 (N.Y. _____________________________ 1989).5 On the facts before us, the relevant discharge is the disposal of the waste into the landfill, not some other unspecified occurrence. The EPA and the private complainants allege that Warwick is liable for cleanup and other response costs at the L&RR Site because Warwick arranged for the disposal of waste at the Site. In essence, the EPA's order, as well as the subsequent ____________________ 5 For the same reason, it is not relevant whether or not Warwick actually knew that its waste materials contained hazardous substances. Independent Petrochemical Corp. v. Aetna Casualty & ________________________________ ________________ Surety Co., 781 F. Supp. 9, 16-17 (D.D.C. 1991), aff'd, 995 F.2d __________ _____ 305 (D.C. Cir. 1993), same finding on this issue in later ________________________________________ proceeding, 842 F. Supp. 575, 584-85 (D.D.C. 1994); Anaconda __________ ________ Minerals Co. v. Stoller Chemical Co., 773 F. Supp. 1498, 1506 ____________ _____________________ (D.Utah 1991), aff'd, 990 F.2d 1175 (10th Cir. 1993). The _____ exclusion bars coverage so long as the discharge of "waste materials" was expected and intended and as long as the property damage is "arising out of" this discharge. On this latter point, the EPA's claim that Warwick's waste contained acids and volatile organic compounds which contributed to the contamination of the Site was sufficient to trigger the pollution exclusion. -20- lawsuit based upon the EPA's actions, state that waste containing hazardous substances was placed in the L&RR landfill and, as a result, the environment surrounding the landfill was contaminated and faced the risk of continued contamination unless remedial measures were taken to shore up the landfill. No cause of the contamination, other than the fact that hazardous substances were placed in the landfill, is mentioned in the order or in the complaint. According to these facts, the "property damage" at issue is the contamination of the environment at the L&RR Site as well as the condition of the landfill itself, which threatens future contamination. As a result, the relevant discharge from which the damage arose is clearly the disposal of waste containing hazardous substances into the landfill. There is no intermediate discharge onto the land causing the damage to the environment. This is not a case involving ruptured or exploding tanks, leaking drums, or even some sort of improper dumping of waste after its arrival at the Site. Although the record contains an affidavit from one of ACME's drivers stating that he dumped waste directly onto the ground, the EPA and the other claimants make no allegation that any improper disposal of wastes occurred at the L&RR Site that might have been unexpected or unintended. In sum, because there is no evidence of any intervening discharge between the disposal of waste on the landfill and the actual damage that eventually resulted, the initial disposal of waste at the Site was the relevant discharge -21- which must be sudden and accidental for coverage to exist under the exception to the pollution exclusion. See, e.g., Broderick, ___ ____ _________ 954 F.2d at 607; Hartford, 962 F.2d at 1490-92; Aardvark, 942 ________ ________ F.2d at 194-96; A. Johnson, 933 F.2d at 72; Triangle Indus., 957 __________ _______________ F.2d at 1157-58; Oklahoma Pub. Co. v. Kansas City Fire & Marine _________________ __________________________ Ins. Co., 805 F. Supp. 905, 910 (W.D.Okla. 1992); G. Heileman ________ ____________ Brewing Co. v. Royal Group, Inc., 779 F. Supp. 736, 740 (S.D.N.Y. ___________ _________________ 1991), aff'd, 969 F.2d 1042 (2d Cir. 1992); Hybud, 597 N.E.2d at _____ _____ 1103; Liberty Mutual Ins. Co. v. SCA Services, Inc., 588 N.E.2d ________________________ __________________ 1346, 1350-51 (Mass. 1992); Borg-Warner, 577 N.Y.S.2d at 957-58; ___________ Mays, 799 P.2d at 657. ____ Warwick argues that the damage in this case arose from the release of pollutants from the landfill into the surrounding environment -- a discharge that was neither expected nor intended. To put it another way, the relevant discharge for purposes of the pollution exclusion was the escape of hazardous substances from a state of containment at the L&RR landfill into or upon the land outside the confines of the landfill. Warwick highlights the EPA statement that "the landfill continues to release Hazardous Substances to the environment." At the very least, Warwick asserts, the language of the pollution exclusion is ambiguous as to the meaning of "discharge" in this context where several possible releases exist. See, e.g., Patz v. St. ___ ____ ____ ___ Paul Fire & Marine Ins. Co., No. 93-2135, 1994 WL 27280, at *3-5 ___________________________ (7th Cir. Feb. 2, 1994); F.L. Aerospace v. Aetna Casualty & _______________ _________________ Surety Co., 897 F.2d 214, 220 (6th Cir. 1990); Nestle Foods Corp. __________ __________________ -22- v. Aetna Casualty & Surety Co., 842 F. Supp. 125, 131-32 (D.N.J. ___________________________ 1993); Pepper's Steel & Alloys, Inc. v. United States Fidelity & _____________________________ ________________________ Guar. Co., 668 F. Supp. 1541, 1549 (S.D.Fla. 1987); Queen City __________ __________ Farms, Inc. v. Central Nat'l Ins. Co., 827 P.2d 1024 (Wash. App. ____________ ______________________ 1 Div. 1992); United States Fidelity & Guar. Co. v. Specialty ____________________________________ _________ Coatings Co., 535 N.E.2d 1071, 1075-77 (Ill. App. 1 Dist. 1989). ____________ We reject Warwick's argument as merely an attempt to recast the damages in this case as a separate discharge. As previously noted, the contract is clear that what must be sudden and accidental is the discharge and not the resulting damages. The damage in this case is the contamination of the environment by hazardous substances disposed of in the landfill. This environmental damage is essentially coterminous with the so- called "release" of hazardous substances from the landfill to the environment. To describe such releases as a separate event constituting an independent discharge would eviscerate the important distinction established between intentional and expected damages and intentional and expected discharges. See ___ Broderick, 954 F.2d at 607 ("[The insured] tries to shift the _________ focus to the second discharge and attempts to graft an intent requirement related to damages onto the unambiguous language of _______ the policy's exclusion clause. However, whether [the insured] intended the waste to seep into groundwater and cause damage after the initial discharges into the land is not relevant.") (emphasis in original). Thus, the fact that Warwick did not intend or expect the environmental damage at the L&RR Site is -23- irrelevant. What matters is whether the initial discharge "into or upon land" that led to the damage is expected or intended; "only the initial release is relevant to the 'sudden and accidental' inquiry." A. Johnson, 933 F.2d at 72 & n.9; see, __________ ___ e.g., Hartford, 962 F.2d at 1491; Oklahoma Pub., 805 F. Supp. at ____ ________ _____________ 910; Heileman, 779 F. Supp. at 740. ________ Warwick and its amici insist that the landfill is some type of container, like a storage tank, which did not discharge its contents into the environment until some unforeseen, unexpected releasing event occurred. Nothing in the record supports this contention that the L&RR landfill was a containment vessel such that discharges into it would not constitute a discharge "into or upon land." The EPA did state that the landfill "releases" hazardous substances "to the environment," but this simply describes the property damage resulting from the discharge of waste into the landfill. There is no indication the EPA considered the landfill to be a containment vessel from which hazardous substances escaped. To the contrary, the object of the EPA's concern in its 87 page order is the fact that hazardous substances were placed in the L&RR landfill to begin with, not the failure of the landfill to contain wastes or the failure of some party to properly operate and maintain the landfill. We are not presented with a situation like the one recently discussed by Judge Posner in Patz, where the insured ____ intended its disposal pit to serve as a containment vessel due to its clay bottom. Patz, No. 93-2135, 1994 WL 27280, at *3-5. In ____ -24- that case, Judge Posner found cause to believe there may have been a separate unexpected discharge of pollutants subsequent to the placement of waste into the pit. The waste in this case, however, was removed from its containers on Warwick's premises and placed into the landfill -- literally onto the land -- where it later caused contamination. We presume all parties involved expected this to be an acceptable practice, but we see no evidence that the landfill itself was expected to act as a containment vessel. See Broderick, 954 F.2d at 607 n.5 ___ _________ (rejecting contention that "containment ponds" that may have been lined with cement could serve as a container preventing the discharge of waste into them from being a discharge "into or upon land" such that the pollution exclusion applied only when substances were subsequently released from the ponds into the surrounding environment). We therefore reject Warwick's contention that there exists some unexpected and unintended discharge of its wastes triggering the exception to the pollution exclusion. Instead, we agree with the district court to the extent it found the pollution exclusion applicable because Warwick's discharge of waste was expected and intended and thus not "accidental." IV. REGULATORY ESTOPPEL ARGUMENT ESTOPPED IV. REGULATORY ESTOPPEL ARGUMENT ESTOPPED Warwick argues that St. Paul should be estopped or barred from applying the pollution exclusion to the facts of this case because of alleged representations that were made by various parties to state insurance regulatory authorities. See Morton ___ ______ -25- Int'l, Inc. v. General Accident Ins. Co., 629 A.2d 831, 870-76 ____________ __________________________ (N.J. 1993). This argument was never made before the district court. "It has long been the rule of this circuit that arguments not made initially to the district court cannot be raised on appeal." Kale v. Combined Ins. Co., 861 F.2d 746, 755 (1st Cir. ____ _________________ 1988); see, e.g., Vanhaaren v. State Farm Mut. Auto. Ins. Co., ___ ____ _________ _______________________________ 989 F.2d 1, 4-5 (1st Cir. 1993). Warwick claims that it raised the estoppel issue when it argued: In short, the insurance industry was able to obtain approval of the pollution exclusion clause by labelling it merely a "clarification" that would not change coverage for pollution claims. This Court should treat the clause accordingly. This statement hardly raises the issue of estoppel for the district court's consideration. Warwick's statement was made in conjunction with Warwick's submission to the court of various materials relating to representations made before the state insurance regulatory board. The submissions and motions all related to the argument that the insurance contract was ambiguous and should be interpreted in favor of Warwick. No claim of estoppel was made at the time. Consequently, the issue is waived. We find no "egregious circumstances" or "miscarriages of justice" that would allow us to transgress our rule against raising issues for the first time on appeal. Kale, 861 F.2d at ____ 755. Furthermore, this case presents no other special -26- circumstances, such as an issue which "the district court expressly and unequivocally addressed" or an "an ongoing injunction, constraining part of a governmental program," that might otherwise give us the authority to decide the issue. Trailer Marine Transport Corp. v. Rivera V zquez, 977 F.2d 1, 6 ______________________________ ______________ (1st Cir. 1992). V. MOTIONS DELAYED AND MOTIONS DENIED V. MOTIONS DELAYED AND MOTIONS DENIED Apparently unsatisfied with the argumentation presented in their briefs and in the briefs of various amici, the parties _____ in this case have filed a huge batch of additional motions and materials in this case. As a consequence, we received more paperwork after the case was briefed and argued than we did before argument. Because the majority of this deluge is either superfluous, moot, or flaunts even a liberal application of our rules concerning page limits and the proper subject matter for motions and other filings, we deny most of the motions and strike many of the other filings. For the record, we deny the motion for certification and grant St. Paul's motion to strike Warwick's supplemental brief in support of certification. St. Paul's motions to strike extrinsic materials or alternatively expand the record are moot as we found no cause to consider the extrinsic materials. Warwick's motion to strike St. Paul's effusive filing on the Nestle case is granted. We deny St. Paul leave to file responses ______ and replies to various reply briefs and to Warwick's opposition to St. Paul's motion to strike extrinsic evidence. In the -27- alternative, we grant Warwick's motion to strike St. Paul's responses and replies. Lest we neglect the amici, we deny amicus _____ ______ Textron's motion to file a reply to several other amicus briefs and we find that St. Paul's motion to strike material in Textron's brief is moot. Finally, we deny Mid-America Legal Foundation permission to file an amicus brief and we grant Warwick's motion to strike Aetna's amicus brief. We affirm the district court's order of summary _______________________________________________________ judgment and dispose of all other motions as described above. ____________________________________________________________ -28-